

**MICHAEL MAILER FILMS**

April ,24 2009

Mr. Matthew Chapman
c/o William Morris Agency
151 El Camino Dr.
Beverly Hills, CA 90212
Attn: Alan Gasmer

### Re: "The Ledge"/Option Agreement

Dear Matthew:

This is to confirm the agreement whereby Matthew Chapman (hereafter "You" or "Writer" as applicable) and your successors, are granting to Michael Mailer Films, Inc. with offices at 81 Worth St, New York, NY 10013, and their successors, licensees and assigns (herein collectively, "Producer") the exclusive and irrevocable option to acquire certain rights, title and interests in and to that certain screenplay entitled "The Ledge" (herein, the "Property") written by you.

In consideration of the representations, warranties and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, you and Producer hereby agree as follows:

1.      OPTION. In consideration of the payment of Five Thousand Dollars ($5,000) and Producer's best efforts to arrange for the development and production of the first motion picture ("Picture") based upon the Property (which activities of Producer Writer hereby acknowledges constitute a material benefit for Writer), Writer hereby grants to Producer the exclusive and irrevocable option ("Option") for a period of TWELVE (12) MONTHS ("Option Period") commencing upon Writer's execution of this Agreement, to acquire certain rights, title and interests (under Copyright or otherwise) in and to the Property in perpetuity throughout the universe. Specifically, Writer hereby grants Producer the following rights in and relating to the Property:

>    (a) All motion picture rights including, but not limited to, the rights to produce, project, exhibit, broadcast and transmit one or more motion pictures theatrically, non-theatrically, on television, by means of cassettes, dvds and cartridges, and in all other media, now and hereafter known, and in all gauges and sizes;

>    (b) All television rights including, but not limited to, the rights to produce, exhibit, broadcast and transmit one or more television productions (including without limitation "series" and "specials", as such terms are commonly understood in the United States television industry), on broadcast, cable, satellite or any other form of television now or hereafter known;

(c) All radio rights including, but not limited to, the rights to produce, broadcast and transmit one or more radio productions, including without limitation "series", "specials", "interview programs" or "feature stories", as such terms are commonly understood in the United States radio industry:

(d) All rights relating to a sound recording, or soundtrack, including spoken words, dialogue, music and songs, by any manner or means whether extracted from or based upon the Property;

(e) Subject to reserved merchandising rights related to stage rights, all rights relating to merchandising and commercial tie-ins of any sort and nature arising out of or connected with the Property and/or the title thereof and/or the characters contained therein of any motion picture, television, and radio works of any and all kinds;

(f) All CD-ROM or video game rights relating to the Property;

(g) All Internet rights.

Producer may, prior to the expiration of the Option Period, extend the Option for an additional Twelve (12) month period ("Extended Option Period") by written notice to Writer and payment of the sum of Seventy-Five Thousand Dollars ($7,500) ("Extension Payment"). The Extended Option Period, if applicable, shall be deemed to be included in the Option Period. The Extension Payment, if any, shall be non-applicable against the Purchase Price for the Property set forth in Paragraph 2a hereof.

The Option Period shall be extended upon written notice for periods equal to the duration of: (i) events of force majeure (as the same are customarily defined in the motion picture industry, including, without limitation, labor disputes) materially preventing Producer's development of the Picture; (ii) your uncured material breach of this agreement; and (iii) any bona fide third party claim(s) in connection with the Option or any of the rights granted or to be granted to Producer pursuant hereto. Notwithstanding the foregoing, no extension based upon the occurrence of a force majeure event shall continue for more than ninety (90) days (consecutively or in the aggregate); no extension based upon a bona fide third party claim shall extend the option period for more than sixty (60) days unless litigation is commenced; and the aggregate of all extensions of the option period (if any) pursuant to this paragraph shall not exceed one year.

2. COMPENSATION. Producer shall pay to Writer, as full and complete consideration for all of the rights granted hereunder the following:

(a) Purchase Price: Producer may exercise the Option at any time prior to the expiration of the Option Period (as the same may be extended pursuant hereto), by written notice thereof to Writer and payment to Writer upon exercise of Option, but not later than the commencement of principal photography of the Picture. The "Purchase Price" shall be an amount equal to TWO AND ONE HALF (2.5%) PERCENT of the final approved budget (not inclusive of actual, verifiable, out-of-pocket, third party finance charges, bank fees, completion bond fees, contingent deferments, and contingency allowance) with a floor of a HUNDRED THOUSAND ($100,000) DOLLARS (or applicable WGA minimum, whichever is greater). In the event that Mark Damon/Foresight Unlimited and affiliates produce and/or finance the Picture as a third parity, the final approved budget for purposes of calculating Writer's fee will also NOT include third party overhead of 7.5% to be capped at $500,000(Five Hundred Thousand Dollars) and thirdp party producing fees also to be capped at $500, 000(Five Hundred Thousand Dollars).

"The Ledge" Writer Agmt.
Page 2

(b) <u>Contingent Compensation</u>: Provided you fully perform all material obligations hereunder and you have not been terminated for uncured material breach or default hereof, Producer shall also pay you Five Percent (5%) of One Hundred Percent (100%) of the profits, if any, derived from the sale, distribution and other exploitation of the Picture or any element thereof (including all allied, ancillary, subsidiary and incidental rights therein and related thereto) in all media and territories throughout the world in perpetuity, which amount shall be defined, computed, accounted for and paid on a basis no less favorable than all other profit participants in the Picture including but not limited the definition and calculation contained in Producer's agreements with third party distributors and licensees. Said 5% of 100% shall be separate from and in addition to the participation payable to You pursuant to the director's agreement in connection with the Picture. No participant in the Picture's profits or revenues (other than a bona fide financier or distributor of the Picture) shall receive a more favorable definition of profits or revenue participation than You. Producer makes no representation that the Picture will generate any profits, or any particular amount of profits. You will have customary audit and accounting rights in connection with the Picture, including the right to inspect Producer's books and records in connection with the Picture, Producer's agreements with third parties in connection with the Picture, and accounting statements Producer receives from third parties in connection with the Picture. Producer agrees to keep complete and accurate books and records in connection with the Picture and to use best efforts to obligate all third party distributors and licensees to keep complete and accurate books and records in connection with the Picture. No participation in the revenues and/or profits of the Picture paid to any other profit participant shall reduce Your share of the Picture's profits. Deferments will not exceed FIVE HUNDRED THOUSAND ($500,000) DOLLARS, and further provided that with the exception of any deferments paid to principal cast or required below-the-line union deferments, no one else connected with the Picture will receive a deferment without You as writer/rights-holder also receiving a deferment in an amount to be negotiated in good faith.

(c) <u>Award and Revenue Bonuses</u>: You will receive a bonus of $50,000 if You are nominated for the Academy Award for best screenplay, and an additional $100,000 bonus if you win such award, with such bonuses paid when and if you receive such nomination and/or award. In addition, You will be entitled to the following box office bonuses at various points in the revenue stream from the Picture: (i) $25,000 when revenues from the distribution and other exploitation of the Picture in all territories and media (and including all allied, ancillary, subsidiary and incidental rights in and to the Picture) equal three times the negative cost of the Picture (which for this purpose will be defined and calculated in the same manner as the "final approved budget" of the Picture in subparagraph 2(a) above); an additional $25,000 when revenues from the Picture equal four times the negative cost of the Picture; and an additional $35,000 when revenues from the Picture equal five times the negative cost of the Picture.

(d) <u>Script Sale Profits</u>: In the event Producer options or sells the Property to a third party for an amount in excess of the option and purchase price payable to Writer hereunder, any such excess shall be payable 50% to Producer and 50% to Writer.

3.      CREDITS. In accordance with WGA Agreement you will receive credit on a single card in the main titles, whether the main titles appear at the beginning or end of the Picture (if at the end of the picture, in accordance with WGA requirements and in the main grouping of principal creative credits), on all positive prints of the Picture, and in paid ads, a credit in the form of "written and directed by Matthew Chapman." Alternatively, you may elect in your discretion to receive separate writing and directing credits, each on a single card.

**Credit Exclusions.** All references in this Agreement to the customary credit exclusions

of Producer shall mean the following forms of advertising: group, list, institutional or so-called teaser advertising, publicity and exploitation; special advertising; advertising relating primarily to the source material upon which the Picture is based, or to the author, any member of the principal cast of the Picture; so-called "award" or "congratulatory" advertisements in which only the honoree is billed, including advertisements or announcements relating to consideration or nomination for an award; trailers or other advertising, publicity or exploitation on screen; advertising on radio or television; advertising in narrative form; advertising for film festivals, film markets and the like; advertising eight (8) column inches in size or less; outdoor advertising (including, but not limited to so-called 24-sheets); theatre display advertising; advertising relating to subsidiary or ancillary rights in the Picture (including, but not limited to novelizations, screenplay and other publications, products or merchandising, soundtrack recordings, videocassettes, videodiscs and other home video devices and the covers, packages, containers or jackets therefore); advertising in which no credit is accorded other than credit to one (1) or two (2) stars of the Picture and/or any other Producer financing or distributing the Picture; advertising, publicity and exploitation relating to by-products or commercial tie-ups; and other advertising not relating primarily to the Picture. Notwithstanding the foregoing, you shall receive credit in any "excluded" ads or materials (including publicity and marketing materials, dvd/video and soundtrack packaging, etc.) in which a billing block appears, as well as any ads, publicity or marketing materials, dvd/video/sountrack packaging materials, etc. in which any other individual other than principal cast receives credit (excepting only award and nomination ads in which only the person being congratulated or honored is mentioned).

Size as used herein shall mean equal duration, height, prominence, width and thickness. Except as expressly set forth above, all matters affecting or relating to credits for the Picture shall be determined by Producer, in its sole and absolute discretion, including without limitation, the size, color, style of type used for, and the placement of, Your credit on screen and in paid advertising. In the event Producer fails to accord You credit in accordance with this Agreement, You may by written notice request that Producer correct such failure and Producer shall thereafter use reasonable good faith efforts to cure prospectively any such material failure to accord You credit hereunder with respect to positive prints created and/or paid advertising or other materials prepared and disseminated by Producer after the date of Producer's receipt of such notice. No casual or inadvertent failure by Producer, nor any failure by any third party, to comply with the credit provisions of this paragraph shall be deemed a breach of the Agreement by Producer, and in the event of any failure by Producer to comply with the provisions hereof, Your remedy therefore shall be limited to an action at law for monetary damages and You hereby waive and relinquish any right for injunctive or other equitable relief. Producer shall contractually obligate the U.S. distributor in writing to comply with the credit obligations herein. Producer shall make best efforts to contractually obligate and in all events shall notify in writing any foreign distributor or foreign sales agents of the credit obligations herein. Producer shall use reasonable efforts to enforce such contractual obligations with third parties.

4.    NO OBLIGATION.    You acknowledge that Producer will be advancing certain development monies in connection with the Picture and the Property in reliance on the Option. However, nothing herein contained shall obligate Producer to exercise the Option, or, if the Option is exercised, actually to produce a motion picture or other program based thereon, provided all compensation that is or may become due is paid, or to otherwise utilize any of the rights granted or services furnished, subject to the other terms of this Agreement.

5.    GRANT OF RIGHTS.    Upon exercise of the Option and payment of the Purchase Price, Producer shall own, exclusively and forever, and without the necessity of further documentation, all rights of every kind and nature whatsoever, whether now known or hereafter devised, in and to the Property, including without limitation, all motion picture, television, home video, internet, and so-called ancillary and subsidiary rights therein, throughout the universe, in perpetuity. Notwithstanding the foregoing, if

principal photography of the Picture does not commence within eighteen (18) months of exercise of the option, all rights in and to the Property and the project shall revert exclusively to you, subject to a lien in Producer's favor in the amount of Producer's actual, direct, verifiable, out-of-pocket, third party expenses incurred directly and solely in connection with the development of the project, payable if and when principal photography of the Picture subsequently commences (if at all) without Producer's involvement.

6.     ADAPTATION. So far as you are concerned, Producer shall have the right to revise, change, adapt, modify, interpolate in, transpose, add material to and/or remove material from (herein collectively "revise") the Property so long as the Producer has given you meaningful consultation. You hereby waive, and you hereby agree to waive, the benefits of any provision of law known as the "droit moral" or any similar law in any country of the world and agree not to institute, support, maintain or permit any action or lawsuit on the ground that any motion picture or other production produced, distributed, exhibited or exploited by Producer in any way constitutes an infringement of any of your droit moral or is in any way a defamation or mutilation of the Property or any parts thereof or contains unauthorized variations, alterations, modifications, changes or translations. Notwithstanding the foregoing, all changes to the Property shall be mutually approved by you and Producer, and the Property shall not be rewritten by anyone else without your prior written permission.

7.     WARRANTIES. You represent and warrant to the best of your knowledge in the exercise of reasonable prudence that:

(a)The Property is original (other than such portions thereof as are in the public domain);

(b)To the best of your knowledge as Writer, neither the Property nor any element thereof nor the exploitation thereof does or will in any way infringe upon or violate any copyright, right of privacy or publicity, common law rights, or any other rights, or constitute a libel or slander against, any person, firm, or corporation whomsoever;

(c) As of the date hereof You own all right, title and interest in and to the Property free and clear of any liens, encumbrances and other third party interests of any kind and free of any claims or litigation, whether pending or threatened;

(d)You have the full right and power to make and perform this agreement without the consent of any third party;

(e)The Property has not previously been exploited in any dramatic or audiovisual media, whether as a motion picture, television production, play or otherwise, and no rights have been granted to any third parties to do so;

(f)You wrote the Property and you are the author-at-law and owner of the Property and entitled to all copyrights therein for the duration of copyright, with the right to make such changes therein and uses thereof as you may determine as author-at-law.

8.     INDEMNIFICATION. :

(a)You agree to indemnify and hold Producer and its partners, agents, licensees, successors and assigns, harmless from and against any liability, claim, cost, damage, or expense (including reasonable outside attorney's fees and costs, whether or not in connection with litigation) arising out of or in connection with a breach by you of any warranties or representations contained in this agreement.

(b)Producer agrees to indemnify and hold you harmless from and against any liability, claim, cost, damage, or expense (including reasonable attorney's fees and costs, whether or not in connection with litigation), arising out of any material inserted into the Property by Producer (or at Producer's request) or its designees or any revisions of the Property performed by Producer or its designees or at Producer's request, or in regards to the development, production, distribution, or exploitation of the Picture or from Producer's breach of agreement.

9.      NO INJUNCTIVE RELIEF. In the event of any breach by Producer of this agreement other than the failure to pay the Purchase Price, you shall be limited to your remedy at law for damages, if any, and shall not have the right to terminate or rescind this agreement or any of the rights granted hereunder or in any way to enjoin or restrain the development, production, distribution, advertising, publicizing or other exploitation of the Picture or any other production based on the Property.

10.     FURTHER INSTRUMENTS. At Producer's request, you shall promptly sign or cause the signature of any and all additional documents (including certificates or authorship, short-form options and short-form assignments) consistent herewith, and will perform or cause the performance of any other acts consistent herewith, which Producer may reasonably deem necessary and proper to effectuate the purposes of this agreement. Upon your failure to do so within a reasonable time after your receipt of the document and the request from Producer and a reasonable opportunity to review and negotiate the language of any such document, you hereby appoint Producer as your attorney-in-fact for such purpose (it being acknowledged that such appointment is irrevocable and shall be deemed a power coupled with an interest), with full power to sign and deliver such documents and with full powers of substitution and delegation. The assignment will be held in escrow by my attorneys, and will only be released by them, or utilized for any purpose, upon payment of the purchase price.

Concurrently with the signature of this agreement, you are signing and delivering to Producer the short-form Option, the short-form Assignment and the Certificate of Authorship attached hereto as Exhibits "A," "B" and "C," respectively. Upon Producer's exercise, if any, of the Option, the short-form Assignment shall be deemed effective as of the date of such exercise without further action (and Producer shall be authorized to enter such date on the short-form Assignment accordingly). If Producer does not exercise the Option, the short-form Assignment shall be of no force or effect, and Producer will promptly return it to you. If Producer exercises the option but the project and Property subsequently revert to you pursuant to paragraph 5 hereof, Producer agrees to execute and deliver to you any and all documents reasonably necessary or desirable (or requested by any third party) to effectuate such reversion of rights, and in the event Producer fails to execute any such documents Producer hereby appoints you as its attorney-in-fact to execute documents on Producer's behalf upon the same terms as reciprocally provided above.

11.     PUBLICITY. Except for incidental mention, you shall not authorize or cause to be released or disseminated any publicity with respect to this agreement, the Property, the Picture or the rights granted to Producer hereunder, without the prior written consent of the Producer.

12.     NAME AND LIKENESS. Upon your consent, which shall not he unreasonably withheld, Producer has the irrevocable and perpetual right to use your pre-approved name, pre-approved likeness, voice and/or pre-approved biography in connection with the production, exhibition, advertising and other exploitation of the Picture and other productions, if any, based upon the Property and all subsidiary and ancillary rights therein, provided that in no event shall Producer authorize any such use as a direct endorsement of any product or service without your prior written consent. Provided that you submit to Producer a sufficient amount of acceptable autobiographical material and a photograph of

yourself of acceptable quality, Producer agrees to use only the material submitted by you for purposes of this paragraph.

13.     RESULTS AND PROCEEDS. Subject to the WGA Agreement and your reversion right set forth in paragraph 5 above, Producer shall be the sole and exclusive owner in perpetuity throughout the universe of all of the results and proceeds of Your writing services in connection with the Picture, which shall be a "work-made-for-hire" specially ordered or commissioned by Producer under United States Copyright Law, provide that Prodtucer shall not own the pre-existing screenplay unless and until the option is exercised and the purchase price paid, which pre-existing work is not a work made for hire for Producer. Subject to payment of the Purchase Price, You hereby waive (i) any right of rescission, termination or to injunctive or other equitable relief with respect to the Picture or any rights therein, thereto or in connection therewith (including the production, distribution, exhibition, advertising, promotion and/or other exploitation thereof) and/or this agreement or its enforcement, and (ii) so-called moral rights of authors or droit moral or similar rights which You may now or hereafter have.

14.     NOTICES. All notices or payments which Producer is required or may desire to give you hereunder shall be in writing and shall be give either by personal delivery, facsimile or by registered or certified mail (postage prepaid) to the appropriate party at the address indicated at the beginning of this agreement, and the date of such personal delivery, faxing or two days after mailing shall be the date of the receiving of such notice. Courtesy copies of all notices sent to you will be sent concurrently to David Evans, 1541 Ocean Avenue, Suite 200, Santa Monica, CA 90401. All notices which you are required or may desire to serve upon Producer hereunder may be served by delivering them to Producer or by sending them by first-class mail, facsimile or personal delivery to Producer at the address set forth above, or to such other addresses as Producer may from time to time designate in writing. The date of delivery, faxing or two days after mailing of such notice, as the case may be, shall be deemed the date of service of such notice.

15.     ASSIGNMENT. Producer shall have the right to freely assign this agreement and/or any of Producer's rights hereunder to any person, firm or corporation. In the event of any such assignment, Producer shall remain liable to you unless such assignment is to a "major" or "mini-major" motion picture studio or distributor or similarly financially responsible third party and such assignee assumes all of Producer's obligations hereunder in writing. Producer agrees that it will not assign this agreement or Producer's rights hereunder to any third party other than a major or mini-major except in connection with the production, financing and/or distribution of the Picture with Producer's involvement.

16.     EXPIRATION OF OPTION. In the event that Producer fails duly and timely to exercise the Option, Producer shall have no further rights in and to the Property, and all rights in and to the Property and the project (including any material created by Producer or you during the option period) will revert solely to you with no lien, attachment or reimbursement obligation of any kind.

17.     PASSIVE ROYALTIES. If the Picture is produced Producer shall pay You the following in connection with any subsequent audio-visual production (e.g., theatrical sequel, prequel or remake, MOW, miniseries, television pilot/series, hereinafter "Subsequent Production") you are not engaged to write:

(a)     Sequel or Remake: If any theatrical remakes, prequels or sequels to the Picture are produced, Producer shall pay You upon commencement of principal photography of each such remake or sequel:

(i)     With respect to each such remake, an amount equal to 2.5% of the budget (less completion bond fee, contingency allowance and actual, out-of-pocket, third

party financing costs), such payment due on commencement of principal photography, but no less than 100% of the Purchase Price, plus a percentage of the profits from such remake equal to one-half of the percentage of profits you are entitled to in connection with the original picture, defined, computed, accounted for and paid in the same manner as provided herein.

(ii)     With respect to each such sequel or prequel, an amount equal to 2-1/2% of the budget, such payment due on commencement of principal photography, but not less than 100% of the Purchase Price, plus a percentage of the profits from such remake equal to one-half of the percentage of profits you are entitled to in connection with the original picture, defined, computed, accounted for and paid in the same manner as provided herein.

(b)     MOW or Mini-Series:  For MOW's or Mini-series, You shall receive a one-time payment in the amount of $15,000 for each hour for the initial 2 hours thereof, and $10,000 for each hour (pro-rated for lesser periods) of such program thereafter up to an aggregate of $100,000 for an entire mini-series, payable upon commencement of principal photography. If a television movie is released theatrically in domestic and/or foreign markets, you will be paid customary 100/50/50 bonus(es).

(c)     TV:  In the event a television series is produced, including spin-offs, You shall receive a royalty for each episode produced of $3,500 for 1/2 hour or less of programming; $4,000 per 1 hour (but more than 30 minutes) of programming and $4,500 per program in excess of 60 minutes. In addition, for each of the aforementioned episodes that are rerun in the U.S. and/or Canada, Producer shall pay You as a worldwide "buy-out" a sum equal to 100% of the initial applicable episode royalty, prorated over the first 5 reruns of each such episode, i.e., 20% for each such rerun. You shall receive all series payments upon the earlier of broadcast of each episode or receipt of the applicable license fee.

(d) Passive payments for any other type of audio-visual Subsequent Production (e.g., direct to video/dvd) will be negotiated in good faith within customary industry parameters.

18.     RESERVED RIGHTS.  In addition to applicable reserved rights under the WGA Agreement, you hereby reserve the following rights ("Reserved Rights") in and to the Screenplay upon the terms and conditions herein:

(a)     Live Dramatic Stage Rights.  All legitimate, dramatic and musical live stage rights, including TV and radio advertising, music and publishing, cast album and merchandising rights, which shall be deemed to include Your right to perform live readings of the Screenplay (as distinguished from recorded and distributed audio-visual readings of the Screenplay);

(b)     Holdback Period. Subject to the WGA Agreement, You agree not to exercise, license, sell, exploit or otherwise dispose of, or permit or authorize the exercise, license, sale, exploitation or other disposal of, any of the rights in the Screenplay reserved by You hereunder (other than the rights reserved pursuant to subparagraph (a) above) until the expiration of 3 years after commencement of principal photography or 2 years following the first exhibition of the Picture, whichever first occurs.

19.    RIGHT OF FIRST NEGOTIATION FOR WRITING SERVICES. Provided that You have not
                been terminated for material uncured Default, that You receive sole Screenplay credit for
                the Picture, and that You are available as, when and where reasonably required by
                Producer, then for a period of seven (7) years following the first general theatrical release
                of the Picture, if Producer or its successors, licensees or assigns, elects, in its sole
                discretion, to develop or produce a theatrical sequel or prequel or theatrical remake of the
                Picture (collectively, "theatrical production"), or a television MOW, television mini-
                series or television series pilot (or first episode if there is no pilot) based on the Picture
                (collectively "TV production"), or any other type of audio-visual subsequent production,
                You shall have a thirty (30) day right of first negotiation with respect to your writing
                services on the screenplay for the first such theatrical production and the first such TV
                and other production (and each succeeding theatrical production and/or TV or other
                production provided that You rendered writing services in connection with the
                immediately preceding theatrical production and/or TV or other production), upon terms
                and conditions to be negotiated in good faith within customary industry parameters (with
                a floor of the financial terms of this deal with respect to a theatrical sequel or prequel or
                theatrical remake only), and subject to network approval with respect to any TV series
                production (Producer shall use best commercial efforts to get You approved). If Producer
                and You do not reach agreement with respect to your services on any such theatrical
                production or TV or other production within said thirty (30) day period, or if You are
                unavailable or decline to render services in connection therewith, as and when reasonably
                required by Producer, or You do not fully perform all material services required by
                Producer in connection with a prior theatrical production or TV production written by
                You, as applicable, your first negotiation right shall terminate with respect to that
                particular type of production (e.g., theatrical or television) and Producer shall have no
                further obligation to You with respect thereto, except to the extent You are entitled to
                payments pursuant to Paragraph 17 above. In the event You do render services under this
                Paragraph 19, the payment negotiated therefor shall be in lieu of the payments provided
                for with respect to that specific production pursuant to Paragraph 17 above.

         20.    VIDEOCASSETTE/DVD/POSTER. Provided You are not in material breach of default
hereof, at such time as videocassettes and dvds have been manufactured, You shall be entitled to a Beta
SP videocassette and a dvd copy of the Picture subject to the terms and conditions imposed by the
distributor. You shall also be entitled to a copy of the principal poster used in connection with publicity
and promotion for the Picture, when the same is available.

         21.    PREVIEWS / PREMIERES & FESTIVALS. You shall be invited to all previews,
screenings, and premieres held by Producer or any assignee of Producer or the principal domestic
distributor of the Picture. In addition, Producer shall invite You and your non-business companion to
attend one (1) U.S. celebrity premiere of the Picture, if any. You and your non-business companion shall
be invited to all festivals to which the Picture is accepted. If any producer's travel expenses are paid for
or reimbursed by the Distributor, sales agent or financier of the Picture to attend such Premieres/Festivals
then your expenses (for two if applicable) will be paid on a favored nations basis with all producers of
the Picture.

         22.    INSURANCE. You and your loan-out company, Asylum Films, Inc., will be covered as
additional named insured under Producer's Errors and Omissions and General Liability insurance policies
in connection with the Picture, subject to limitations, restrictions and terms of said policies.    The
provisions of this paragraph shall not be construed so as to limit or otherwise affect any obligation,
representation or agreement by You hereunder.

23.    OTHER TERMS AND CONDITIONS.  Producer intends to submit to You and negotiate in good faith within industry parameters a more formal agreement incorporating the above terms as well as others customary to agreements of this nature, including without limitation, Producer's rights of suspension and termination.  Until such time, if ever, that such agreement is fully executed, however, this agreement shall be the entire agreement between the parties with respect to the subject matter hereof and shall supersede any and all prior or contemporaneous oral or written agreements or understandings. This agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within such State and no provision hereof may be modified, waived or amended except pursuant to a writing signed by the parties.

24.    MISCELLANEOUS.  This Agreement shall be governed by, construed and enforced under the laws of the State of New York.  If for any reason any provision of this Agreement is adjudged by a court to be unenforceable, such adjudication shall in no way affect any other provisions of this Agreement or the validity or enforcement of the remainder of this Agreement, and the affected provision shall be modified or curtailed only to the extent necessary to bring it into compliance with applicable law. This Agreement expresses the entire understanding between Writer and Producer, and supersedes any previous agreement, whether written or oral, between the parties.  This agreement may be modified or amended only by a writing signed by the party to be charged with said modification or amendment.

25.  WGA AGREEMENT.  This Agreement and your engagement and the rights granted herein are subject in all respects to the WGA Basic Agreement. Producer represents, warrants and agrees that at all relevant times it is and will remain a signatory to the WGA Agreement. Producer will make all applicable WGA Pension, Health and Welfare payments on behalf of you and your loan-out company.

26.  TRAVEL/EXPENSES.  If You are required by Producer to travel in connection with the Picture, transportation, accommodations and per diem will be per the WGA Agreement, as well as on a most favored nations basis with any individual producer involved with the Picture.

This Agreement shall be binding upon your heirs, successors and assigns, except for your services to be rendered hereunder, which are personal to you and may not be assigned by you.   You may assign your rights to payment hereunder to a personal service corporation or other entity owned or controlled by you or your heirs, administrators and/or executors.

If the foregoing reflects your understanding of the agreement between us, please sign your name in the space provided below.  This agreement is dated April 24, 2009.

MICHAEL MAILER FILMS, INC.

By: _____
    Michael Mailer

Its_____

READ, ACCEPTED AND AGREED
to be  bound by all of the
terms of this Agreement _____

    Matthew Chapman

## OPTION AGREEMENT

For good and valuable consideration, receipt of which is hereby acknowledged, the undersigned, Matthew Chapman ("Assignor") grants to Michael Mailer Films, Inc. ("Assignee") the exclusive and irrevocable right and option to purchase, exclusively and forever, all motion picture, television, home video, subsidiary and allied rights and other rights in all languages and for the entire universe in perpetuity, in and to that certain screenplay entitled, "The Ledge" along with all adaptations, dramatizations and translations thereof and the titles and themes thereof, all as set forth in and subject to that certain letter agreement ("Agreement") between Assignor and Assignee dated April 24, 2009. Assignee's option to purchase said rights shall be for the period ending not earlier than the close of business on April 24, 2010. If option is extended as provided in the Agreement said rights shall be for the period not ending earlier than the close of business on April 24, 2011.

Assignor and Assignee acknowledge that this short-form Option Agreement should be read in conjunction with the Agreement, and in the event of any conflict between the provisions of this instrument and the Agreement, the provisions of the Agreement shall control.

IN WITNESS WHEREOF, Assignor has signed this instrument on the _4_ day of _May 2009_ 2009.

("Assignor")

By: _____

Matthew Chapman, Writer

## ASSIGNMENT

For good and valuable consideration, receipt of which is hereby acknowledged, the undersigned, Matthew Chapman ("Assignor") hereby irrevocably grants, sells and assigns to Michael Mailer Films, Inc. ("Assignee"), all motion picture, television, home video, subsidiary and allied rights and other rights, in all languages and for the entire universe in perpetuity in and to that certain screenplay entitled, "The Ledge" (the "Property"), and all adaptations, dramatizations and translations thereof and the titles and themes thereof.

This assignment is executed and delivered pursuant to that certain letter agreement ("Agreement") dated April 24, 2009 between Assignor and Assignee relating to the Property. Reference is hereby made to the Agreement for further particulars with reference to Assignee's rights in, to and with respect to the Property and this Assignment is subject in all respects to the Agreement.

IN WITNESS WHEREOF, Assignor has executed this assignment on the 4 day of May 2009, 2009.

("Assignor")

By: _____
Matthew Chapman

## CERTIFICATE OF RESULTS AND PROCEEDS
## FOR WRITING SERVICES

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, you, Matthew Chapman, hereby acknowledge and agree that all material of whatever kind or nature (including, without limitation, all ideas, suggestions, themes, plots, stories, characterizations, dialogue, titles and other material), furnished or to be furnished, by you (all such material and all such results and proceeds being referred to collectively herein as the "Material") in connection with your writing services for the proposed motion picture project presently entitled "The Ledge" (the "Picture"), was and/or will be solely created by You as a "work-made-for-hire" specially ordered or commissioned by Michael Mailer Films, Inc. ("Producer") for use as part of the Picture with Producer being deemed the sole author of all now known or hereafter existing rights of every kind or nature, throughout the world in perpetuity (including, without limitation, all copyrights and all extensions and renewals of such copyrights) in and to the Material, with the right to use and exploit the Material, in any manner, in all media and forms now known or hereafter existing, and make all changes in the Material as Producer deems necessary or desirable; it being understood that in the event such Material (or any part thereof) is determined not to be a "work-made-for-hire", then You hereby irrevocably grant, assign and vest Producer, in perpetuity, with all now known or hereafter existing rights of copyrights and all extensions and renewals of such copyrights) in and to such results and proceeds and/or Material throughout the world and the right to use and exploit such Material in any and all media and forms now known or hereafter existing, hereby irrevocably waive all rights of "droit moral" or any similar rights or principles of law which You may now or later have in the Material. Notwithstanding the foregoing, Producer agrees and acknowledges that the pre-existing screenplay as of the date Producer and you entered into our option agreement with respect to the Picture is not a work made for hire and Producer will not own any rights therein unless and until Producer exercises the option, and that this Certificate of Results and Proceeds is subject in all respects to said option agreement, including but not limited to the reversion provisions thereof.

You warrant and represent to the best of your knowledge in the exercise of reasonable prudence that:  (a) You have the right to execute this document;  (b) the Material (other than to the extent the Material is in the public domain) is or shall be original with You; (c) the Material does not and shall not defame or disparage any person or entity or infringe upon or violate the rights of privacy, publicity, copyright, trademark or any other rights of any kind or nature whatsoever of any person or entity; (d) as of the date hereof the Material is not the subject of any litigation or of any claim that might give rise to litigation; (e) You have not done and will not do, any act or thing which diminishes, impairs or otherwise derogates from the full enjoyment by Producer of all of Producer's rights in and to the Material;  (f) You have not heretofore assigned, conveyed, encumbered and/or otherwise disposed of any rights in and to the Material. You shall indemnify and hold harmless Producer and Producer's employees and its officers, agents, successors, assigns and licensees from and against any and all liabilities, claims, costs, damages, and expenses (including reasonable outside attorneys' fees and disbursements) arising out of or in connection with a breach of the foregoing covenants, warranties and representations.

You hereby grant to Producer the right to issue and authorize publicity concerning, and to use Your name, voice, approved likeness and approved biographical data in connection with the distribution, exhibition, advertising and exploitation of the Picture and all rights therein, provided no such use of your name, voice, likeness or biographical information shall (with the exception of billing block uses) be in connection with directly endorsing any product or service (other than the Picture) without your prior written approval.

You agree to execute and documents and to do any other acts consistent herewith as may be required by Producer or its assignees or licensees to further evidence or effectuate Producer's rights as set forth in this

"The Ledge" Writer Agmt.
Page 13

Certificate.  Upon your failure promptly to do so within five (5) business days following receipt of Producer's request and a reasonable opportunity for you to review and negotiate the language thereof, you hereby appoint Producer as your attorney-in-fact for such purposes (it being acknowledged that such appointment is irrevocable and coupled with an interest) with full power of substitution and delegation. Producer will provide you with a copy of any such documents executed on your behalf.

You further acknowledge and agree that: (i) in the event of any breach hereunder by Producer, You will be limited to Your remedy at law for damages, if any, and will not have the right to terminate or rescind this Certificate or to restrain, enjoin or otherwise impair the production, distribution, advertising, publicizing or exploitation of the Picture or any rights therein, (ii) nothing herein shall obligate Producer to produce, advertise or distribute the Picture, and (iii) this Certificate shall be governed by the laws of the State of New York applicable to agreements executed and to be performed entirely therein.

You agree that Producer's rights with respect to the Material and/or your services may be freely assigned and licensed and if such assignment is to a major or mini-major U.S. motion picture company or similarly financially responsible party Producer shall be relieved of its obligations hereunder.  In the event of such assignment or license, this Agreement shall remain binding upon you and inure to the benefit of any such assignee or licensee.

The parties have caused this document to be executed as of ___May 4___, 2009.

READ, ACCEPTED AND AGREED
to be bound by all of the terms of this Agreement.

Matthew Chapman



# michelle dunton

research for motion pictures and television

**TO:**            **James Portolese / Signature Pictures**

**RE:**            **THE LEDGE**

**FROM:**       **Michelle Dunton**
                **323-257-2118 / mdunton@mac.com**

**DATE:**        **February 26, 2010**

**NUMBER OF PAGES:**     **8**

## SCRIPT BASED RESEARCH REPORT

*This report is a tool to be used in the process of script & storyboard clearance. It is not an insurance policy, a guarantee against any form of legal liability or action. We do not provide legal advice either through this report or otherwise. We strongly recommend that our Clients obtain legal counsel for the purpose of interpreting the information in this report for an assessment of legal risks. An errors and omissions policy should be in place for every production. We encourage our Clients to inquire about the findings included in this report if they appear unclear in any way. Upon request, it will be our pleasure to disclose to you the methods that we have used to obtain the information contained in this report.*

*At the request of the client, we will provide opinions, when warranted by the material, in regard to the visual elements contained in the storyboards provided to us. Any opinions given are based on our collective experience in motion picture and television production. Our opinions, however, should not be confused with legal advice. We are not a law firm, nor do we formally employ legal counsel on behalf of our clients.*

*This report is intended only for use by the Client as listed above and no other person shall have or acquire any rights to use this report. Any liability arising out of or in any way related to the preparation or use of, or reliance on, this report is limited to the amount of fee paid by the Client for the report. Please note that this report applies only to the property as identified by the title and draft date as listed in the legend above, and a new report should be obtained if such property is changed in any way.*

*The Client's acceptance and use of this report constitutes an acceptance of the foregoing terms, conditions and limitations.*

**Research for "The Ledge", screenplay by Matthew Chapman; Draft dated 2/2/10.**

We presume this script is a work of fiction not based on any preexisting work, and does not reflect any data pertaining to actual persons (living or deceased) or events, unless otherwise noted.

## STANDARD NOTES

1. Incidental characters who are not named (such as BEGGAR, OLD MAN, etc.) will not be mentioned in the cast list unless use might allude to an identifiable person. Please note that it is not possible to check the name of a character who is identified by his or her given name only.

2. We assume that all automobile use will conform to your production company's auto use policy (if such a policy exists).

3. Actual telephone numbers are typically not used in motion picture and television productions, either visually or audibly. We have been advised that the telephone numbers (in all area codes) ranging from 555-0100 through 555-0199 are not currently working numbers and that they will not be put into active service. We have also been advised that the only 800 number which will not be put into active service is 800-555-0199. There are presently no 900 numbers reserved for use by the entertainment industry.

4. Locations will be noted in this report ONLY if any actual locale is referenced. It is customary to obtain location agreements for all locations used in motion picture and television productions.

5. We presume that all intellectual properties used which have not been created specifically for use in this production will be formally cleared through their respective owners / creators.

6. Commercial identification can cause problems when productions air on television. Only specific references to specific products will be referenced in this report. Possible derogatory references will be noted as well.

### Location: Baton Rouge, LA
### Time: Present Day with flashbacks

| **CAST** | **COMMENT** |
|---|---|
| **Gavin Nichols** page 1, scene 3 | We find numerous (more than ten) residential listings for this name in the U.S., none in LA. We find no relevant Google listing for this name. **We find no conflict.** |
| **Hollis Lucetti** p.1, s.4 | We find no residential listing for this exact or similar name in the U.S. We find no listing with the Baton Rouge Police Department for an officer with this exact or similar name. We find no Google listing for this exact or similar name. **We find no conflict.** |
| **Lieutenant Markowitz** p.4, s.12 | We find numerous (more than thirty) residential listings for this surname in LA, one in Baton Rouge (*Jack Markowitz)*. **We recommend a name change.** |
| **Harper** p.7, s.14 | Given name only; see opening note #1. |
| **Shana** p.10, s.15 | Given name only; see opening note #1. |
| **Joe** p.10, s.15 | Given name only; see opening note #1. |
| **Chris** p.14, s.21 | Given name only; see opening note #1. |
| **Landon** p.17, s.22 | Given name only; see opening note #1. |
| **Selena** p.17, s.22 | Given name only; see opening note #1. |
| **Consuela** p.17, s.22 | Given name only; see opening note #1. |
| **Gail Lucetti** p.31, s.33 | We find no residential listing for this exact name in the U.S. We find one residential listing in the U.S. for the similar name *Gail Luchetti* (70) in Hopland, CA. **We find no conflict.** |
| **Jimmy Lucetti** p.31, s.33 | We find no residential listing for this exact or similar name in the U.S. We find nine residential listings in the U.S. for the similar name *James Luchetti*, none in LA. **We find no conflict.** |
| **Brian Lucetti** p.31, s.33 | We find no residential listing for this name in the U.S. We find one residential listing in the U.S. for the similar name *Brian Luchetti* (39), in Champaign, IL. **We find no conflict.** |
| **Angela Lucetti** p.32, s.33 | We find no residential listing for this name in the U.S. We find two residential listings in the U.S. for the similar name *Angela Luchetti*, none in LA. **We find no conflict.** |
| **Frank** p.47, s.55 | Given name only; see opening note #1. |
| **Marianna Lucetti** p.52, s.62 | We find no residential listing for this exact name in the U.S. We find one residential listing in the U.S. for the similar name *Maryann Lucetti* (72) in Allentown, PA. **We find no conflict.** |

**PAGE/SCENE #    EXTERIORS**

NOTE FOR ALL EXTERIOR LOCATIONS: Possible location agreement. Advise permission is obtained for use of any copyrighted or protected material. Presume any names to be visible for signage will be checked through research.

| | |
|---|---|
| 1, 1 | *SHOTS OF A CITY* |
| 1, 2 | *APARTMENT BUILDING* |
| 3, 11 | *LARGE MODERN BUILDING* |
| 10, 16 | *STREET NEAR APARTMENT* |
| 10, 18 | *CRESCENT HOTEL* |
| 27, 30 | *PARK* |
| 31, 33 | *HOLLIS HOUSE* |
| 62, 73 | *STORES* |
| 63, 78 | *HOSPITAL PARKING LOT* |
| 103, 158 | *STREET IN A BAD NEIGHBORHOOD* |

**PAGE/SCENE #    INTERIORS**

NOTE FOR ALL INTERIOR LOCATIONS: Avoid identification of copyrighted or protected material, or data pertaining to actual persons, firms or organizations.

| | |
|---|---|
| 1, 3 | *GAVIN'S APARTMENT* |
| 1, 4-5 | *FERTILITY CLINIC / EXAMINING ROOM / DOCTOR'S OFFICE* |
| 1, 5 | *TAMLACKER BUILDING* |
| 3, 7 | *CATHOLIC CHURCH -* |
| 3, 8 | *CRESCENT HOTEL / ROOM 1009* |
| 3, 12 | *POLICE STATION / HOLLIS'S OFFICE* |
| 9, 15 | *APARTMENT BUILDING HALLWAY* |
| 10, 19-20 | *CRESCENT HOTEL / LOBBY / GAVIN'S OFFICE* |
| 17, 22 | *CRESCENT HOTEL / OFFICES* |
| 18, 23 | *JOE AND SHANA'S APARTMENT* |
| 25, 29 | *CRESCENT HOTEL / A ROOM* |
| 32, 34 | *HOLLIS'S HOUSE* |
| 39, 47 | *CRESCENT HOTEL / BAR* |
| 39, 48 | *JOE AND SHANA'S  BATHROOM* |
| 40, 49 | *JOE AND SHANA'S KITCHEN* |
| 48, 58 | *PROTESTANT CHURCH* |
| 63, 76 | *GPS FACTORY* |
| 77, 114 | *GAVIN'S BEDROOM* |
| 94, 129 | *TAMLACKER BUILDING / ROOM* |
| 97, 140&142 | *TAMLACKER HALLWAY / EMPTY ROOM AND OFFICE* |
| 103, 157 | *POLICE STATION HALLWAY* |
| 103, 159 | *CATHOLIC CHURCH* |

**PAGE/SCENE #**     **GENERAL NOTES**

1, 3        *in his hand is a PHOTOGRAPH just taken from a wallet* – Advise permission is obtained from any photo subject identifiable on screen who is not a cast member. Advise permission is obtained for use of any copyrighted or protected material. This note also applies to the following: *Family pictures* p.53; *Gavin's photo of his little girl* p.54; *digital images, photos of Shana, religious images, shots of a mission in Africa* p.87; *photos of Joe's kids* p.88 and *photo of naked Japanese woman* p.91.

1, 5        **TAMLACKER BUILDING** – We find no federal or state trademark listing for this name. We find no business listing for this name in the U.S. We find no Google listing for this name. If this is an actual building, please secure a location agreement.

1, 4        **FERTILITY CLINIC…DOCTOR** - Possible identification of actual hospital, care facility or nursing order by name, uniform, logo, badge, design, etc.

1, 6        *(Hollis) "We've known each other for fifteen years, DON (CONNOLLY)…"* – We find numerous (more than one hundred) residential listings for this exact name in the U.S., none in LA. We find no additional residential listing in LA for similar spellings of this name. **We find no conflict.**

1, 6        *(Hollis) "…and JAN CONNOLLY"* - We find numerous (more than one hundred) residential listings for this exact name in the U.S., none in LA. We find two residential listings in LA for the similar name *Janet Connolly*, in Baton Rouge and New Orleans. **We recommend a name change.**

3, 7        *when he looks up at a STATUE of the Virgin Mary, his face is bathed in tears* – Avoid identification of copyrighted or protected material. This note also applies to the following; *Statue of Mary cradling baby Jesus* p.103.

3, 8        **THE CRESCENT HOTEL** - We find no federal or state trademark listing for this exact name. We find two federal trademark listings for the following similar names; *Rosewood Crescent Hotel* by Rosewood Hotels and Resorts, LLC in Dallas, TX (registered) and *Hotel Crescent Court* by RRCC Limited in Dallas, TX (registered). We find two state trademark listings for the following similar names; *Hotel Crescent Court* by RRCC Limited in TX (registered) and *Crescent Hotels* by Crescent Hotel Group in AZ (nonrenewed). We find no business listing for this exact name in the U.S. We find three business listings in the U.S. for the following similar names; *Crescent Hotel* in Kansas City, MO; *Crescent Hotel* in Quincy, WA and *1886 Crescent Hotel & Spa* in Eureka Springs, AR. We find two business listings in LA for the following similar names; *Omni Royal Crescent Hotel* in New Orleans and *Queen and Crescent Hotel* in New Orleans. We find Google listings for a hotel with this exact name, in Scarborough, England. **We recommend a slight alteration in the name to avoid similarity to the Omni Royal Crescent Hotel in New Orleans.**

3, 12       **POLICE STATION** – Avoid identification of the Baton Rouge police department through the use of protected badges, patches, logos, vehicles, mottos, etc. This note also applies to all other uses of police uniforms, vehicles, etc throughout the script.

4, 12    **(Markowitz) "I'll see if I can find PARTRIDGE to relieve you"** – Surname use only. We find numerous (more than twenty) residential listings for this surname in Baton Rouge, LA. **We find no conflict.**

10, 16    **Gavin and Shana stand at a BUS STOP...the BUS arrives** – Avoid identification of Baton Rouge city transportation services by name, logo, uniform, etc. This note also applies to the following: *the BUS DRIVER waits, Shana swipes her CARD* p.40.

10, 19    **Harper wears a HOUSEKEEPING UNIFORM** – Presume any logos or insignias used for uniforms will be created especially for this production and will not identify any copyrighted or protected material. If any nametags are used, please forward for research.

11, 19    **Harper produces a massive vibrator from her uniform** – Possible permission from manufacturer.

14, 20    **Shana gives him the (telephone) NUMBER. He DIALS** – Please see opening note #3 regarding telephone numbers. This note also applies to the following; *Joe takes out his cell phone and starts DIALING* p.98.

14, 20    **Gavin hears an electric guitar, ten seconds of something beautiful being well played** - MUSIC CLEARANCE.

14, 21    **Chris has a RED STRING around one wrist** – Presume bracelet will be created especially for this production, if not, please obtain permission from the manufacturer.

14, 21    **Gavin and Chris drink WINE** – Possible commercial identification. Wine bottle is seen again on page18.

18, 23    **Joe straightens a PICTURE of Christ on the cross that's in the hallway** - Advise permission is obtained from owner and/or artist whose work is identifiable on screen.

19, 23    **Gavin now sees an ELECTRIC GUITAR** – Possible permission from manufacturer for featured use. Guitar is seen again on pages 41, 75 and 104.

19, 23    **next to very small PIGNOSE AMP** – Advise permission is obtained from Pignose-Gorilla (702) 648-2444.

24, 25    **(Chris) "They don't talk about this down at the Kabbalah Center, okay?"** – Dialogue reference to actual organization The Kabbalah Centre International. There is not a Kabbalah Centre in Louisiana. **We recommend a name change.**

24, 25    **(Gavin) "Leviticus. 'If a man lies with a man as one lies with a woman, both of them have done what is detestable. They must be put to death"** – Quote from Leviticus 20:13 (New International Version).

25, 28    **5 year old girl clutches a TEDDY-BEAR** - Avoid identification of copyrighted or protected material.

28, 30      **(Gavin) "Stella okay with you?" Shana takes one of the BOTTLES** –
Identification of product brand in dialogue and prop use.

29, 30      **(Gavin) "I guess they figured no one was actually gonna read it so they turned
it into this New Age crap, like E.G.O. – EVERYBODY'S GOT ONE"** - We find no
federal or state trademark listing for this name. We find no listing with the U.S.
Copyright Office for this title. We find no listing for a book with this title. We find one
listing for a song with this exact title by Angelika Wagener and Ofer Golany. This title
appears to be a topic in the Kabbalah teachings.

29, 30      **(Gavin) "The DNA of the Soul" Crock of shit** - We find no federal or state
trademark listing for this name. We find no listing with the U.S. Copyright Office for
this title. We find numerous Google references to books, articles and candles with
this title/name. Dialogue reference may be considered derogatory to the Kabbalah
Centre.

31, 33      **Hollis gets out of his CAR** – If any license plate numbers are identifiable, please
forward for research. This note also applies to the following: *Joe's car* p.63; *cab* p.66
and *red truck* p.67.

34, 41      **Shana at the bus stop reading a BOOK** - Possible identification of copyrighted or
protected material.

41, 50 & 53      **Gavin takes a BOOK out of his bag and starts to read...Shana trying to do her
HOMEWORK** - Possible identification of copyrighted or protected material.

47, 54      **Chris sprinkling the doorstep with water from a PLASTIC BOTTLE** – If Kabbalah
water brand is identifiable, by name, logo, etc. please obtain permission.

49, 59      **(Shana) "We're going to a new church. THE IVORY COAST"** – We presume
dialogue reference is to the Mission Ivory Coast in New York. If not, we recommend
a name change.

52, 61      **Hollis's (CELL) PHONE RINGS** – Possible commercial identification. Avoid
identification of copyrighted or protected sound effects or music as generated by cell
phone use. Please see opening note #3 regarding telephone numbers. This note
also applies to the following: *Hispanic maid's cell phone* p.55; *Gavin's cell phone
rings* p.63 and *Shana's cell phone* p.75.

56, 68      **Chris opens his LAPTOP** – Avoid commercial identification of computer hardware
and software, particularly screen design and sound effects as generated by any
copyrighted software. Avoid identification of data pertaining to actual persons, firms
or organizations on computers or peripherals. This note also applies to the following:
*Joe's computer* p.65.

56, 68      **we see a man on screen talking but without sound** – We presume this scene will
created especially for this production. If not, please obtain permission.

57, 68      **Gavin goes to a bag and takes out a PACK OF CIGARETTES** – We recommend
creating fictitious tobacco brands for prop use.

62, 71        **a SONG starts to play** - MUSIC CLEARANCE.

63, 76        **Joe takes a small GPS DEVICE from the drawer and puts it in his pocket** -
              Avoid identification of copyrighted or protected material.

63, 78        **HOSPITAL PARKING LOT** - Avoid identification of actual hospital, care facility or
              nursing order by name, uniform, logo, badge, design, etc.

65, 83        **in GOOGLE MAPS style, it is clear exactly where the car has stopped** – Advise
              permission is obtained for use of any copyrighted or protected material.

65, 85        **(Joe) "I need a cab from 762 DEGRAVE..."** – We find no listing with the U.S.
              Postal Service for this address in Baton Rouge, LA. **We find no conflict.**

65, 85        **(Joe) "...to the corner of 3rd and HUNTER"** – We find listings with the U.S. Postal
              Service for these streets in Baton Rouge, LA. We find no Google or Mapquest listing
              for this intersection. **We find no conflict.**

66, 88        **Joe arrives in a CAB** - Avoid identification of actual taxi service by name, uniform,
              logo, design, badge, number, etc.

75, 109       **her TEDDY BEAR is looking at her from the bed** - Avoid identification of
              copyrighted or protected material.

75, 109       **Shana sprays a little PERFUME** - Possible identification of perfume brand by
              name, logo, bottle shape, etc.

77, 114       **large black and white PHOTOGRAPH of a shooting star** - Advise permission is
              obtained from owner and/or artist whose work is identifiable on screen.

78, 114       **Gavin walks to a BOTTLE OF WHISKY, pours two glasses** - Possible commercial
              identification.

83, 117       **a TV NEWS CREW** - Avoid identification of actual news services, radio or television
              stations or networks, or other media, firms or organizations.

86, 122       **Shana returns with a BAG OF GROCERIES** - Avoid identification of actual grocery
              store by name, logo, design, etc. Possible commercial identification.

87, 124       **next to the lamp is a BIBLE** - Avoid identification of copyrighted or protected
              material.

88, 124       **Gavin sees two TATTOOS on Joe's left forearm** - Avoid identification of
              copyrighted or protected material. Advise permission is obtained from owner/artist
              whose work is identifiable on screen, whether or not the work is copyrighted.

103, 157      **an electric guitar piece starts** - MUSIC CLEARANCE.
                                    **END OF REPORT**
**Please do not hesitate to call us with any questions that you may have regarding the information
contained in this report.**



**State of California**
**Kevin Shelley**
**Secretary of State**

Filer # 2 0 0 4 3 0 6 1 0 0 0 6

**LIMITED LIABILITY COMPANY**
**ARTICLES OF ORGANIZATION**

**ENDORSED - FILED**
In the office of the Secretary of State
of the State of California

OCT 2 9 2004

**KEVIN SHELLEY**
**Secretary of State**

NOTE: A limited liability company is not permitted to render
professional services.

A $70.00 filing fee must accompany this form.

This Space For Filing Use Only

IMPORTANT – Read instructions before completing this form.

1. NAME OF THE LIMITED LIABILITY COMPANY (END THE NAME WITH THE WORDS "LIMITED LIABILITY COMPANY," "LTD. LIABILITY CO.," OR THE ABBREVIATIONS "LLC" OR "L.L.C.")
Foresight Unlimited, LLC

2. THE PURPOSE OF THE LIMITED LIABILITY COMPANY IS TO ENGAGE IN ANY LAWFUL ACT OR ACTIVITY FOR WHICH A LIMITED LIABILITY COMPANY MAY BE ORGANIZED UNDER THE BEVERLY-KILLEA LIMITED LIABILITY COMPANY ACT.

INITIAL AGENT FOR SERVICE OF PROCESS – If the agent is an individual, the agent must reside in California and both items 3 and 4 must be completed. If the agent is a corporation, the agent does not have to file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and item 3 must be completed (leave item 4 blank).

3. NAME OF THE INITIAL AGENT FOR SERVICE OF PROCESS:  Michael Beljer

4. IF AN INDIVIDUAL, THE ADDRESS OF THE INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA

ADDRESS  14011 Ventura Blvd., Suite 602

CITY  Sherman Oaks                              STATE  CA.      ZIP CODE  91423

5. THE LIMITED LIABILITY COMPANY WILL BE MANAGED BY: (CHECK ONLY ONE)
[✓] ONE MANAGER
[ ] MORE THAN ONE MANAGER
[ ] ALL LIMITED LIABILITY COMPANY MEMBER(S)

6. ADDITIONAL INFORMATION SET FORTH ON THE ATTACHED PAGES, IF ANY, IS INCORPORATED HEREIN BY THIS REFERENCE AND MADE A PART OF THIS CERTIFICATE.

7. TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY (NON-INFORMATIONAL PURPOSES ONLY)
motion picture production

8. I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

_____
SIGNATURE OF ORGANIZER

October 29, 2004
DATE

Michael A. Ross
TYPE OR PRINT NAME OF ORGANIZER

9. RETURN TO:

NAME     [ Michael A. Ross
FIRM       Nationwide Incorporators
ADDRESS   1445 E. Los Angeles Ave., Suite 301A
CITY/STATE  Simi Valley, CA 93065
ZIP CODE  ]

LLC-1 (REV 06/2004)                                    APPROVED

2005   13:36am   From-LORING WARD INC                3102204411              T-776   P.001/003   F-274



## SECRETARY OF STATE

I, *Kevin Shelley*, Secretary of State of the State of California, hereby certify:

That the attached transcript of __1__ page(s) has been compared with the record on file in this office, of which it purports to be a copy, and that it is full, true and correct.



*IN WITNESS WHEREOF,* I execute this certificate and affix the Great Seal of the State of California this day of

_____

**NOV 0 1 2004**

*Kevin Shelley*

Secretary of State

EXHIBIT "D"

This **BONDED** Delivery Schedule is attached to and made part of that certain Amended and Restated Motion Picture Sales Agency Agreement (the "Agreement") dated as of **March 3, 2010, between The Ledge Distribution, LLC** ("Owner") and **Foresight Unlimited, LLC** ("Agent") with respect to the motion picture entitled: "**THE LEDGE**" (the "Picture"). All capitalized terms shall have the meaning assigned in the Agreement unless otherwise defined herein. Delivery of the Picture shall consist of Owner making physical delivery, at the sole cost and expense of the Owner, of the items set forth herein with respect to the Picture, in accordance with the standard set forth with respect to the applicable item herein and/or in the Agreement, or, if no standard is set forth with respect to the particular item, then acceptable in form, substance and/or content to the reasonable satisfaction of the appropriate personnel of Agent or Agent's designees. Where laboratory Access is granted to Agent, Owner shall use the Laboratory Access Letter substantially in the form of Schedule "AA", attached hereto. Delivery shall be made to such Delivery Locations as Agent shall designate. *All items in those sections I-IV (marked with \*) are considered Laboratory Delivery Items, and items in sections V-VI (marked with \*\*) are considered Sales Agent Delivery Items (as defined in the Interparty Agreement, if any, to which this Delivery Schedule is attached).*

**\*I.**   *Picture Items:* All materials must be conformed to the international version credits. Materials to be delivered to Foresight Unlimited, LLC, 2934 ½ Beverly Glen Circle, Suite 900, Bel Air, CA 90077, Attention: Distribution, or such other address or individual as Foresight shall determine.

A.   Digital Intermediate Negative and Answer Print: A Laboratory Access Letter granting Agent access to the digital intermediate 35mm picture Negative and Answer Print of the Picture, which shall: be fully-cut, edited and assembled complete with credits and main, narrative (if any), end and all descriptive titles. Negative must conform in all respects to the final edited version of the action work print of the Picture. Negative shall be full frame (i.e., Owner will not use a hard matte during photography). Negative must be of first class technical quality and be ready and suitable for use in the printing of commercially acceptable positive prints.

B.   Interpositive Protection Master: One (1) 35mm fully timed color Interpositive Protection Masters of the Picture, conformed in all respects to the Answer Print.

C.   Internegative: One (1) fully timed commercially acceptable 35mm color Internegative made from the Color Interpositive Protection Master.

D.   Optical Sound Track Negative: One (1) 35mm Optical Sound Track Negative in Dolby SRD in synchronization with the above Internegatives suitable for use in making first class 35mm theatrical release prints of the Picture and made from the Dolby Stereo Soundtrack specified in paragraph I. (G) below.

E.   35mm Check Print: One (1) 35mm composite color Check Print corresponding to the Internegatives and Optical Tracks specified above.

F.   35mm Textless Backgrounds: One (1) 35mm fully timed textless optical house original Interpositive of all title background material (textless) including main, end and

1

explanatory title backgrounds (such as locales, translations, year, etc.). In addition, one internegative and cheek print created from the Interpositive element.

G.    Intentionally Deleted.

H.    Dolby Stereo Sound Track:  A Laboratory Access Letter granting Agent access to one (1) MO Diskette 5.1 Dolby SRD composite mix of the final stereo dub made from the fully mixed dubbing stems, in perfect synchronization with the Original Picture Negative.

I.    Stereo 2-Track and 6-Track Printmasters: One (1) ProTools DVDR Dolby Surround encoded stereo two-track printmaster with SR noise reduction of the original language dubbed soundtrack of the Picture ("printmaster") from which the stereo Optical Soundtrack Negative specified above (item I.D.) has been made.  In addition, one (1) DA-88 6-track discrete printmaster with Dolby SR noise reduction. Master shall be delivered with the following specifications (NTSC video reference): Film Speed: 23.98 Frames;  Timecode: 29.97 Frames; Format: SRD; Sample Rating: 48 KHZ; No Noise Reduction. Channel configuration:  CH1 – L; CH2 – C; CH3 – R; CH4 – LS; CH5 – RS; CH6 – SW (B); CH7 – Option; CH8 – Dialogue Guide.

J.    D/M&E:  One (1) ProTools DVDR stereo discrete Dialogue, Music, and Effects made from the fully mixed dubbing stems, in perfect synchronization with the Original Picture Negative

K.    Dialogue/Music/Effects stems: One (1) ProTools DVDR of each of the 5.1 dialogue, music and effects stems used.  Effects stem must be fully filled and each stem must be in perfect synchronization with the original picture negative specified above (Item I.A).

L.    International Music and Effects Track Master:  One (1) ProTools DVDR of the fully mixed 5.1 Dolby SRD International Music and Effects Track Master, which shall contain fully mixed music and effects with the effects track completely filled with Foley and duplicating any production sound effects so that there are no effects whatsoever missing. Master shall be delivered with the following specifications (NTSC video reference): Film Speed: 23.98 Frames; Timecode: 29.97 Frames; Format: SRD; Sample Rating: 48 KHZ; No Noise Reduction. Channel configuration:  CH1 – L; CH2 – C; CH3 – R; CH4 – LS; CH5 – RS; CH6 – SW (B); CH7 – Option; CH8 – Dialogue Guide.

M.    Intentionally Deleted.

N.    2-Track Music and Effects Track: One (1) ProTools DVDR Dolby Surround encoded stereo 2-Track of the Music and Effects with SR noise reduction. Master shall be delivered with the following specifications (NTSC video reference): Film Speed: 23.98 Frames;  Timecode: 29.97 Frames; Sample Rating: 48 KHZ; No Noise Reduction.

O.    4+2 Music and Effects Track: One (1) ProTools DVDR master with Dolby SR noise reduction containing stereo music and effects tracks configured Left, Center, Right, Surround on four tracks and extra material on track 5 with clean mono dialogue on track 6. The sound effects on this dub must be fully filled and mixed in perfect synchronization

2

with the Picture negative specified above (Item I.A). The extra materials track shall contain any special sound elements peculiar to the film (e.g. foreign language dialogue, dialogue from on-screen television/radios/computers, grunts, groans, shouts etc.).

P.    Firewire Drive Content:
- ADR Record Sessions (ProTools 5.1 Sessions)
- Foley Records Sessions (ProTools 5.1 Sessions)
- DX / ADR / GRP Units (Editors Pre Mix cut tracks in ProTools 5.1 Sessions)
- Foley Unites (Editors Pre Mix cut tracks in ProTools 5.1 Sessions)
- Music Unties (Editors Pre Mix cut tracks in ProTools 5.1 Sessions)

1. Final Stems
- BG / Foley Stems (reels 1-6)
- Dialogue Stems (reels 1-6)
- FX Stems (reels 1-6)
- Filled FX Stems (used to create M&E's only – reels 1-6)
- Music Stems (reels 1-6)

2. PrintMasters
- 2 Track PrintMaster (reels 1-6)
- 6 Track PrintMaster (reels 1-6)

3. M&E's
- 4+2 M&E's (reels 1-6)
- 6+2 M&E's (reels 1-6)

4. D/M/E's (reels 1-6)

Q. Multi-Track Recordings: A Laboratory Access Letter with a detailed inventory list granting Agent access to all original multi-track recordings of the original music score.

R. Cut-outs/Trims/Lifts: A Laboratory Access Letter with a detailed inventory list granting Agent access to the original negative of all available cut-outs, trims, positive trims, lifts and all other material photographed or recorded by Owner in connection with the production of the Picture. This would also include the 35mm work track (sound), work picture (action); all production dialogue; all sound effects units and pre-dubs; all music units and pre-dubs and all dialogue units and pre-dubs.

S. Alternate Film and Sound Material: A Laboratory Access Letter with a detailed inventory list granting access to Agent to all "cover shots", alternate scenes/alternate dialogue and editorial inventory so that the Picture can be conformed to rating, censorship requirements and/or television and airline exhibition (if required by Agent).

*II.   ***Trailer Items:*** All materials must be conformed to the international version credits. Materials to be delivered to Foresight Unlimited, LLC, 2934 ½ Beverly Glen Circle, Suite 900, Bel Air, CA 90077, Attention: Distribution, or such other address or individual as Foresight shall determine.

3

A.    Original Trailer Negative:  A Laboratory Access Letter granting Agent access to the
      original 35mm trailer negative, which shall be fully cut, edited and assembled; be of first
      class technical quality and ready and suitable for use in the creation of Interpositive
      Protection Masters.

B.    Interpositive Protection Master:  One (1) 35mm fully timed color Interpositive Protection
      Master of the trailer struck from item II (A) above.

C.    Trailer Internegative:  One (1) fully timed Internegative of the trailer (without scratched
      and defects), fully cut, edited and assembled.

D.    Trailer Optical Sound track Negative:  One (1) fully mixed and recorded original 35mm
      Optical Sound Track Negative of the Completed Trailer prepared for printing in perfect
      synchronization with the Trailer Picture Negative.

E.    35mm Check Trailer Print:  One (1) color corrected Check Prints corresponding to the
      Internegative and Optical Sound Track Negative specified above.

F.    I.P. Textless Backgrounds:  One (1) 35mm textless Interpositive of the textless
      background of the trailer titles, credits and inserts of texted scenes (if any), unless the
      trailer titles, credits and/or inserts appear on a blank screen.

G.    MO Diskette containing 5.1 Dolby SRD Composite mix.

H.    Stereo 2-Track and 6-Track Printmasters: One (1) ProTools DVDR Dolby Surround
      encoded stereo two-track printmaster with SR noise reduction of the original language
      dubbed soundtrack of the Trailer ("printmaster") from which the stereo Optical
      Soundtrack Negative specified above (item II.D.) has been made.  In addition, one (1)
      DA-88 6-track discrete printmaster with Dolby SR noise reduction. Master shall be
      delivered with the following specifications (NTSC video reference): Film Speed: 23.98
      Frames;  Timecode: 29.97 Frames; Format: SRD; Sample Rating: 48 KHZ; No Noise
      Reduction.  Channel configuration: CH1 – L; CH2 – C; CH3 – R; CH4 – LS; CH5 – RS;
      CH6 – SW (B); CH7 – Option; CH8 – Dialogue Guide.

I.    International Music and Effects Track Master:  One (1) ProTools DVDR of the fully
      mixed 5.1 Dolby SRD International Music and Effects Track Master, which shall contain
      fully mixed music and effects with the effects track completely filled with Foley and
      duplicating any production sound effects so that there are no effects whatsoever missing.
      Master shall be delivered with the following specifications (NTSC video reference): Film
      Speed: 23.98 Frames;  Timecode: 29.97 Frames; Format: SRD; Sample Rating: 48 KHZ;
      No Noise Reduction.  Channel configuration:  CH1 – L; CH2 – C; CH3 – R; CH4 – LS;
      CH5 – RS; CH6 – SW (B); CH7 – Option; CH8 – Dialogue Guide.

J.    2-Track Music and Effects Track: One (1) ProTools DVDR Dolby Surround encoded
      stereo 2-Track of the Music and Effects with SR noise reduction. Master shall be
      delivered with the following specifications (NTSC video reference): Film Speed: 23.98

4

Frames; Timecode: 29.97 Frames; Format: SRD; Sample Rating: 48 KHZ; No Noise Reduction.

K.    HD, <u>PAL and NTSC Digital Masters</u>: One (1) 1080 23.98psf HDCam SR and one (1) PAL and NTSC standard first-generation digital betacam. Each video Master shall have the following audio configuration:
Channel 1: Stereo Left – Original composite mix
Channel 2: Stereo Right – Original composite mix
Channel 3: Final M/E Left
Channel 4: Final M/E Right

\*III.   *Television/Airline Version:* All materials must be conformed to the international version credits. Materials to be delivered to Foresight Unlimited, LLC, 2934 ½ Beverly Glen Circle, Suite 900, Bel Air, CA 90077, Attention: Distribution, or such other address or individual as Foresight shall determine.

A.    One (1) broadcast quality HDCam SR, and one (1) digital betacam NTSC and one (1) broadcast quality digital betacam PAL digital videotape master of the television/airline version of the picture which conforms to standards and practices and length requirements for the United States and foreign free television and airline exhibition of the picture. Program shall contain all or any part of the alternative scenes and/or dialogue and/or eliminations and/or additions for the purpose of conforming to an acceptable television/airline version. The running time of the television/airline version shall not be less than ninety-two minutes and it should be provided in both 4:3 full frame and 16:9 full frame.

\*IV.   *Video Items:* All materials must be conformed to the international version credits. Materials to be delivered to Foresight Unlimited, LLC, 2934 ½ Beverly Glen Circle, Suite 900, Bel Air, CA 90077, Attention: Distribution, or such other address or individual as Foresight shall determine.

A.    <u>High Definition Master</u>: One (1) HDCAM SR telecine master created from the Feature Interpositive (made from the original Negative) in the following formats: 16:9 (1.78) full frame version, 16:9 (2.35) letterbox version (if applicable), and a 4:3 (1.33) full frame pan & scan, side matted version. Master should be scene-to-scene color corrected. Master must conform in all respects to broadcast television standards throughout the world. The textless backgrounds should be at the tail of each tape. If the original version of the Picture contains subtitling over action (excluding main and end title sequence), Agent shall be provided with a texted and textless master. Each HDCam SR master shall have a 100% ten-channel quality check performed by the video facility that performed the video mastering. In addition, each video Master shall have the following audio configuration:
Channel 1: Stereo Left – Original composite mix
Channel 2: Stereo Right – Original composite mix
Channel 3: Final M/E Left
Channel 4: Final M/E Right
Channel 5-10: 5.1 Printmaster

5

B.   PAL and NTSC Digital Masters: The following Digital Betacam down conversions shall be manufactured from the High-Definition masters specified above (IV.A):

Digital Betacam NTSC 4x3 1.33 full frame pan and scan
Digital Betacam NTSC 16x9 2.35 letterbox (if applicable)
Digital Betacam NTSC 16x9 1.78 full frame
Digital Betacam PAL 4x3 1.33 full frame pan and scan
Digital Betacam PAL 16x9 2.35 letterbox (if applicable)
Digital Betacam PAL 16x9 1.78 full frame

**V.   *Publicity and Advertising items*: *Unless otherwise noted, all written material shall be in the English language.* All materials must be conformed to the international version credits. Materials to be delivered to Foresight Unlimited, LLC, 2934 ½ Beverly Glen Circle, Suite 900, Bel Air, CA 90077, Attention: Distribution, or such other address or individual as Foresight shall determine.

A.   Color Photography: No less than One Hundred (100) high resolution 300dpi digital color images (and original color negatives if shot on film), as approved in advance of delivery to Agent by all persons possessing approval rights over such negatives, together with written proof of such approval. In addition, Agent shall receive access to all color photography connected with the Picture. Negatives and/or transparencies shall be accompanied by a notation identifying the persons and events depicted therein and shall be suitable for reproduction for advertising and publicity purposes.

B.   Black and White Photography: If available, no less than One hundred (100) different Black and White still photograph contact prints, as approved in advance of delivery to Agent by all persons possessing approval rights over such photographs, together with written proof of such approval. In addition, Agent shall be granted access to all original Black and White negatives connected with the Picture. Negatives and/or contact sheets shall be accompanied by a notation identifying the persons and events depicted therein and shall be suitable for reproduction and advertising purposes.

C.   Textless and Texted Artwork Transparency: One (1) final high resolution digital layered file to be used for the one sheet poster and all advertising (approved by talent).

D.   Intentionally Deleted.

E.   Credit Block: A digital word file (and if available reproducible Photostat) of the contractually correct billing block which shall represent exact placement, wording and size of each paid advertising credit.

F.   Biographies: One (1) typewritten Biography of each of the principal players, writers, individual producer(s), director and key technical personnel (director of photography, production designer, costume designer, composer, editor) prepared by the publicist assigned to the Picture.

6

G.      Stories/Articles:  Any publicity kits or stories written by the unit publicist on various aspects of events during production of the Picture, which are deemed by the unit publicist to be suitable for column placement and feature stories, if any, involving the principal players, supporting players, writer(s), and special interest material that the unit publicist has reason to believe will be of use in marketing the Picture.

H.      Production notes:  Notes on the production of the Picture prepared by the unit publicist, including history of the production; illuminating comments by the cast and key filmmakers about the Picture, its significance and its special claims on the interest of the moviegoers.  All Production Notes shall be read and approved by producer, the director and anyone else so designated by the Owner before they are delivered to Agent.

I.      Synopsis:  A brief synopsis in the English language of the story of the Picture (one typewritten page in length).

J.      Advertising Materials:  One (1) copy of all available advertisements, paper accessories and other advertising materials, if any, prepared by Owner in connection with the Picture, including samples of one-sheet posters and individual advertising art elements and transparencies necessary to make proofs thereof.  Also, a video master of the electronic press kit (EPK) and access to all elements used to create the EPK; television and radio spots, featurettes and special features.

**\*\*VI.   _Documentation_:**  _All paperwork shall be delivered in the English language._  All materials must be conformed to the international version credits.  Materials to be delivered to Foresight Unlimited, LLC, 2934 ½ Beverly Glen Circle, Suite 900, Bel Air, CA 90077, Attention: Business Affairs, or such other address or individual as Foresight shall determine.

A.      Combined Continuity and Spotting List:  One (1) original typewritten copy in the English language of a detailed, final dialogue and action continuity and spotting list of the Feature and Trailer containing all dialogue, narration and song vocals, as well as a cut by cut description of the Picture action, conformed to the Answer Print.  If the Picture was recorded in a language other than English, the Continuity shall contain a literal English translation.

B.      Literary Materials:  A copy of the screenplay and final lined shooting script of the Picture.

C.      Music Cue Sheet:  One (1) typewritten original copy of a music cue sheet showing the particulars of all music contained in the Picture and any completed Trailers delivered hereunder, including title of each composition; the names of composers; publishers and copyright owners; the usages (whether instrumental, instrumental-visual, vocal, vocal-visual or otherwise); the place for each composition showing the film footage and running time for each cue; the performing rights society involved any other information customarily set forth in music cue sheets.

D.      Music Contracts/Licenses/Assignments:  Each of the contracts, licenses, license confirmation letters or assignments specified below that conveys to Owner the right to

7

use the music, lyrics or recordings, as applicable, in the Picture, in whole or part, in all media now known or hereafter devised, throughout the universe in perpetuity without payment of any further compensation for the grant of such rights and shall include the right to use the music, lyrics or recordings, as applicable, in connection with the advertising, promotion and publicity of the Picture, in or out of context of the Picture subject only to payment of fees to applicable performing rights societies.

(a)     Music and Lyric contracts: Duplicate originals or legible copies of all contracts covering the acquisition and performance of all music and lyrics utilized in connection with the Picture;

(b) Music Licenses: A copy of valid licenses paid for by Owner for the full period of copyright for the synchronous recording of all copyrighted music and recordings in the Picture and the performance thereof in the licensed territory throughout the entire Term of the Agreement.

For purposes of the Completion Guarantor (Film Finances) only, if fully executed licenses are not available at the time of delivery, confirmation letters, along with proof of payment, will suffice.

E.     Composer Agreement(s): One (1) copy of the original fully executed contract for the services of the composer of the musical soundtrack of the Picture and the sync license from the publisher.

F.     Credit Statement: A statement of credits applicable to the Picture setting forth the names and credit obligations of Owner with regard to all persons to whom Owner is contractually obligated to accord credit on the screen, in any paid advertising, in paperback books, on sound recordings and on videocassette packages. The Credit Statement shall include verification of the writing credits set forth therein by the appropriate writers guild. The credits set forth on the Credit Statement shall conform in every instance to the standard credit requirements of Agent, including without limitation, those requirements set forth in the Agreement (if applicable).

G.     Screen Credit Requirements: One (1) typewritten list of the main and end credits of the Picture with an approved lay-out illustration of the screen and advertising credits with relative size and prominence in percentage.

H.     Director's Guild Credit Approval: If the Picture was produced under the jurisdiction of the Director's Guild of America ("DGA"), a letter from the DGA approving (a) the list of screen credits for the Picture submitted to the DGA pursuant to Article 8-201 of the DGA Basic Agreement, and if appropriate (b) the credits included in the paid advertising campaign material submitted to the DGA pursuant to Article 8-210 of the DGA Basic Agreement.

I.     Cast List & Crew List: One (1) copy of a list indicating the name of the character portrayed by each player, including appropriate contact numbers; and one (1) copy of a

8

list of all technical personnel (including their title and assignment) involved in the production, including appropriate contact numbers.

J.  Licenses/Contracts/Assignments:  Duplicate originals of all licenses, contracts, assignments and/or other written permissions from the proper parties in interest permitting the use of any product, musical, literary, dramatic, copyrighted, trademarked and other materials of whatever nature used in the production, exploitation or advertising of the Picture.

K.  Dolby License:  Executed copy of the License Agreement for use of Dolby Sound (if used) in connection with the Picture.

L.  Editors Codebook: If available, duplicate original or computer diskette of the entire complete codebook.  Codebook will include all key numbers, scene numbers, lab roll numbers, camera roll numbers and sound roll numbers with corresponding dates.

M.  Employment Agreements: Duplicate originals of all documents relating to the employment of all personnel engaged to render services in connection with the Picture, including but not limited to the individual producer(s), director, screenwriter(s), actors, musical performing artist(s), below the line crew, technicians and administrative staff.

N.  Residuals Information:  Intentionally omitted.

O.  Dubbing Restrictions/Approvals:  A statement of: (1) any limitation on use of photographic or non-photographic likeness (2) any restrictions as to the dubbing of the voice of any player including dubbing dialogue in a language other than the language in which the Picture was recorded (if applicable).

P.  MPAA Rating Certificate:  A Certificate evidencing a rating from the Motion Picture Association of America ("MPAA") that is not more restrictive than that specified in the Agreement (if applicable).  For purposes of the Completion Guarantor only, if the Certificate is not available at time of delivery, proof of submission and payment of the applicable MPAA fee will suffice.

Q.  MPAA Title Registration:  Evidence that the title of the Picture has been registered under the rules of the MPAA Title Registration Bureau and that pursuant to such registration procedures, Owner has the right to use the title of the Picture (if applicable).

R.  Certificates of Origin:  Intentionally omitted.

S.  French Authorship Certificate:  Intentionally omitted.

T.  German Tax Exemption Forms:  Intentionally omitted.

U.  Copyright Information:  Detailed information with regard to the copyright proprietor of the Picture, the precise copyright notice to be affixed to all advertising and packaging. Owner shall provide Agent with one copy of the U.S. Certificate of Copyright

9

Registration. For purposes of the Completion Guarantor only, if the Certificate is not available at time of delivery, a copy of the application and proof of submission (and payment) will suffice.

V.   Chain of Title: One (1) copy of all documents evidencing Owner's right to produce, distribute and exploit the Picture including all transfer-of-rights agreements from the author to the Owner. **HEREBY ACKNOWLEDGED AS RECEIVED. (and waived for purposes of the Completion Guarantor).**

X.   Errors and Omissions Policy: A copy of a "Motion Picture Owner and Distributor Errors and Omissions" insurance policy from an insurance company acceptable to Agent, which names Agent and each of the parties indemnified in the Agreement as additional insured. The policy shall provide insurance against any and all claims relating to the Picture and shall have limits of at least█████ with respect to any one claim relating to the Picture, █████ with respect to all claims relating to the Picture in the aggregate and the deductible of the Policy shall not exceed ████. The Policy shall be for an initial period commencing as soon as reasonably practicable and in no event later than commencement of principal photography of the Picture and terminating no earlier than 3 years thereafter, with an option for an additional year and shall be delivered together with evidence indicating that the premium for the Policy has been paid in full for the applicable term. **HEREBY ACKNOWLEDGED AS RECEIVED (and waived for purposes of the Completion Guarantor).**

Y.   Copyright Report and Title Report & Opinion: A current (i.e. issued within six months of the date of the Agreement) Copyright Report and Opinion and Title report and Opinion issued by Thomson & Thomson/Brylawski, Leeds & Komen or Dennis Angel. **HEREBY ACKNOWLEDGED AS RECEIVED (and waived for purposes of the Completion Guarantor).**

10