## STANDARD TERMS AND CONDITIONS

In consideration of the mutual covenants contained herein and for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1.    DEFINITIONS. Where not defined where they first appear in the Agreement, words used in the Agreement are otherwise defined as follows or, if not so defined, in accordance with industry custom:

   1) Airline. The term "Airline" means exploitation of the Picture for direct exhibition in airplanes, where ever located, which are operated by an airline flying the flag of any country in the licensed territory for which the Airline exploitation is granted, but excluding airlines which are customarily licensed from a location outside the licensed territory or which are only serviced in but do not fly the flag of a country in the licensed territory.

   2) Ancillary. The term "Ancillary" means all forms of Airline, Ship and Hotel exploitation of a motion picture.

   3) Cable Free TV. The term "Cable Free TV" means the transmission by means of coaxial or fiber-optic cable of a Motion Picture Copy for reception on a television receiver in private living accommodations without a charge being made to the viewer for the privilege of viewing the motion picture. For purposes of this definition, neither governmental television receiver assessments or taxes, nor the regular periodic service charges (other than a charge paid with respect to Pay TV) paid by a subscriber to a cable television system will be deemed a charge to the viewer.

   4) Cable Pay TV. The term "Cable Pay TV" means transmission or retransmission of a Motion Picture Copy by means of an encoded signal over coaxial or fiber-optic cable for reception on a television receiver in private living accommodations by means of a decoding device where a charge is made: (i) to the viewer for the right to use the decoding device or viewing any special channel which transmits the motion picture along with other programming; or (ii) to the operator of a hotel, motel, apartment complex, co-operative, condominium project, or similar place located distant from the place where such broadcast signal originated for the right to use the decoding device to receive and retransmit the programming on such channel throughout such place.

   5) Collection Costs. The term "Collection Costs" means all actual, out-of-pocket costs and expenses of collection of the distribution agreements, servicing or enforcement of the distribution agreements or otherwise incurred by Agent in accordance with this Agreement, including, but not limited to, any of the following:

      a. All costs of collecting Gross Receipts, including, without limitation, attorneys' fees, accountants' fees, auditing and checking costs and costs of contesting taxes, charges and other expenses.

      b. All reasonable fees and costs of counsel employed by Agent for advice or other representation with respect to any Collateral or this Agreement (other than the original negotiation and documentation of this Agreement) or any other agreement, document, or instrument heretofore, now or hereafter executed by Owner and delivered to Agent, or to commence, defend, or intervene, file a petition, complaint, answer, motion, or other pleadings, or to take any other action in or with respect to any suit or proceeding relating to the Collateral, this Agreement or any other agreement, instrument, or document heretofore, now or hereafter executed by Owner and delivered to Agent, or to protect, collect, lease, sell, take possession of, or liquidate any Collateral, or to attempt to enforce any security interest

Am&RstAm&RstSales Agency.ST&C.v1.doc-Foresight
The Ledge

or lien in any Collateral, or in any way relating to any of the Collateral, or to enforce any rights of Agent or Obligations of Owner, liabilities of Owner, or any other person, firm, or corporation which may be obligated to Agent by virtue of this Agreement or any other agreement, document, or instrument heretofore, now or hereafter delivered to Agent by or for the benefit of Owner.

c.   All Taxes; provided, however, that Agent shall not be entitled to recoup as a Collection Cost any corporate income, franchise or windfall profits taxes payable by Agent. In each instance it shall be the obligation of Owner to timely pay Taxes. However, if Owner does not so pay, Agent is hereby authorized to pay said Taxes and to recoup said Taxes as a Collection Cost.

6)  Commercial Video.  The term "Commercial Video" means the exploitation of a Motion Picture Copy embodied in a Videogram for direct exhibition before an audience by and at the facilities of either organizations not primarily engaged in the business of exhibiting motion pictures, such as in educational organizations, churches, restaurants, bars, clubs, trains, libraries, Red Cross facilities, oil rigs and oil fields, or by and the facilities of governmental bodies such as in embassies, military bases, military vessels, and other governmental faculties flying the flag of the licensed Territory, but only to the extent that such exploitation is not otherwise utilized in the Territory as a form of Non-Theatrical exploitation. By way of clarification but not limitation, Commercial Video does not include Non-Theatrical, Public Video, Airline, Ship or Hotel exploitation.

7)  Delivery.  The term "Delivery" means Delivery of the Picture to Agent in accordance with the provisions of the Agreement.

8)  Distribution Expenses.  The term "Distribution Expenses" means all customary, third party, out-of-pocket costs and expenses actually incurred by Agent in connection with the distribution and exploitation of the Picture, less any discounts, credits, rebates, reimbursements or similar allowances, including but not limited to the following:

   a.   "Print Costs," which include, without limitation, the reasonable and non-discriminatory cost of prints, original and dupe negatives, soundtracks, tapes, cartridges, cassettes and any and all other duplicating material and facilities, together with reels, cans, containers and including inspecting, repairing and renovating, packing, storing, shipping, insuring and all other such costs, including costs of satellite transmission connected with the distribution of the Picture, to the extent that such method of delivery is customarily utilized and is required in order to fully exploit the Picture during the Term.

   b.   All reasonable and non-discriminatory costs of advertising, publicizing, exploiting and promoting the Picture, including promotional allowances and rebates required by Agent's clients as a condition of booking.

   c.   All costs of accommodating the Picture for any and all distribution uses, or delivering the Picture or meeting Owner's obligations, including, without limitation, retitling, removing commercial material, dubbing for foreign distribution or otherwise altering or editing the Picture.

   d.   All Taxes assessed upon the negatives, duplicate negatives, prints, tapes or other materials relating to the Picture, or upon the use or distribution thereof; and any and all sums paid or accrued on account of duties, customs and imposts, costs of acquiring permits, "Kontingents" and any similar authority to secure the entry, licensing or other use of the Picture in any country or part thereof; provided, however, that Agent shall not be entitled to

2

recoup as a Distribution Expense any corporate income, franchise or windfall profits taxes payable by Agent.

e. All royalties and similar payments to manufacturers of sound equipment, cartridges, cassettes, etc. and all payments (including residuals, royalties, payroll taxes and fringe benefits) pursuant to collective bargaining agreements or other agreements by reason of any exhibition of the Picture or the exercise of any rights with respect to the Picture. Notwithstanding the foregoing, as between Owner and Agent, Owner shall be responsible for paying all residuals or other union or guild required payments which may become due as a result of any exploitation of the Picture.

f. All costs and expenses resulting from claims and lawsuits involving the Picture, and protection therefrom, including, without limitation, errors and omissions insurance premiums, costs of copyright searches and registration, and investigation and defense; provided, however, that, to the extent that any such claim or lawsuit is Agent's responsibility under this Agreement or under any other agreement relating to the Picture, the cost thereof shall be borne by Agent and shall not be deducted under this subdivision.

g. All reasonable out-of-pocket travel and entertainment costs actually incurred by Agent and directly related to the sales, exploitation and collection of the Picture, and a fair allocation of such indirect costs related to marketing the Picture.

h. All costs and expenses associated with the preparation, execution, implementation or enforcement of this Agreement, including but not limited to legal and accounting expenses.

i. All Collection Costs.

9) Free TV. The term "Free TV" means all forms of Terrestrial Free TV, Cable Free TV, and Satellite Free TV exploitation of a Motion Picture.

10) Gross Receipts. The term "Gross Receipts" means the sum of the following amounts derived with respect to the exploitation of the Rights hereunder calculated on a continuous basis:

a. all monies received by Agent or its subsidiaries, parent or affiliated companies, or credited to any of their accounts, from the lease, license, sale, rental, barter, distribution, exhibition, performance, exploitation or other exercise of the Rights in the Picture; and

b. all monies received by Agent by way of recovery for the infringement by third parties of the Rights.

11) Notwithstanding the foregoing, the parties acknowledge that the Gross Receipts shall not include any of the following:

a. any amounts collected by any authors' rights organization, performing rights society or governmental agency which amounts are paid to authors, producers or distributors and which arise from royalties, compulsory license, cable retransmission income, tax rebates, exhibition surcharges or the like, which sums, as between Owner and Agent, shall be Owner's sole property;

b. recoupable advances or security deposits, until such time as the same are earned or forfeited, except if any such advances or deposits are non-returnable/non-recoupable, in which event

3

such non-returnable/non-recoupable advances or deposits, shall be credited to Gross Receipts at the time of receipt by Agent;

c. any amounts collected and paid by Agent as taxes or for payment of taxes, such as admission, sales and value-added taxes, provided, however, that, to the extent any such monies are collected by Agent and included in Gross Receipts because they have not been paid to the appropriate authorities as of the time Agent renders an accounting statement to Owner hereunder, and such sums are subsequently paid to the appropriate authorities, such sums shall be deducted as a Distribution Expense.

12) <u>Home Video</u>. The term "Home Video" means the exploitation of a Motion Picture Copy embodied in a Videogram which is rented ("Rental") or sold ("Sell-Thru") to the viewer for viewing the embodied Picture in private living accommodations where no admission fee is charged with respect to such viewing. Home Video does not include the public performance, diffusion, exhibition or broadcast of the Videogram.

13) <u>Home Video Returns/Reserves</u>. For Home Video Rental Receipts, Agent shall be entitled to establish and maintain a reserve for bad debts and returns of Videograms in an amount equal to the greater of (i) twenty percent (20%), or (ii) the actual amount of outstanding inventory requested to be returned. For Home Video Sell-Thru Receipts, Agent shall be entitled to establish and maintain a reserve for bad debts and returns of Videograms in an amount equal to the greater of (i) twenty-five percent (25%), or (ii) the value of the actual distributor inventory of Videograms of the Picture as determined by physical inventory. At the end of one year, Agent will liquidate any such reserves at 25% thereof per quarter, retaining as a reserve an amount equal to the actual outstanding inventory, if any, held by third parties.

14) <u>Hotel</u>. The term "Hotel" means the exploitation of a Picture Copy for direct exhibition in temporary or permanent living accommodations such as hotels, motels, apartment complexes, co-operatives or condominium projects by means of closed-circuit television systems where the telecast originates within or in the immediate vicinity of such living accommodations.

15) <u>Incidental Rights</u>. The term "Incidental Rights" means, subject to the terms and conditions of this Agreement, the following rights:

a. To use the title or titles by which the Picture is or may be known or identified and to change the titles of the Picture.

b. To permit, authorize and license others to exercise and to sub-license all or any of Agent's rights and licenses hereunder and to distribute, exhibit, advertise, publicize and exploit the Picture under any term or terms and in such manner as Agent may deem proper or expedient.

c. To make such dubbed and/or subtitled versions of the Picture and the trailer thereof, including but not limited to, cut-in, synchronized and superimposed versions thereof in any and all languages used in the Territory as Agent may deem advisable and the right to use any such versions now in existence or hereafter prepared by Owner or any of its licensees.

d. To permit commercial messages to be broadcast or telecast before, during and after the exhibition of the Picture.

4

e. To use the name, servicemark(s) and trademark(s) of Agent or any of its subsidiaries on the positive prints of the Picture and in the trailer thereof, and in all advertising and publicity relating thereto, in such manner, position, form and substance as Agent may elect. Agent shall also have the right to indicate on all positive prints of the Picture in the trailer and other advertising and publicity that it or one of its sub-distributors is the distributor of the Picture in such manner and position and by the use of such words and phrases as it shall determine.

f. To make such changes, additions, (including, but not limited to, narration), alterations, cuts, interpolations and eliminations as Agent may require in order to adapt and make the Picture suitable for exhibition in any and all parts of the Territory, to meet the time segment requirements of television stations, to comply with the censorship requirements of any governmental body or to comply with any legal impediments to the exhibition of the Picture. Nothing herein should be deemed to relieve Owner from the warranties and representations made herein.

g. To publicize, advertise and exploit, the Picture throughout the Territory during the Term and to cause or permit others so to do, including, without limitation, the exclusive right in the Territory in connection with, and for the purpose of advertising, publicizing and exploiting, the Picture to:

    i. publish and to license and authorize others to publish in any language used in the Territory and in such forms as Agent may deem advisable, synopses, summaries, resumes and stories of and excerpts (not to exceed Seven Thousand Five Hundred (7,500) words) from the Picture and from any literary or dramatic material included in the Picture or upon which the Picture is based, in newspapers, magazines, trade periodicals, booklets, pressbooks and any other periodicals and in any and all other types of advertising and publicity now known or hereafter created or devised, in any and all media; and

    ii. broadcast by radio and television and to license and authorize others to so broadcast, without further consideration, in any language used in the Territory-, the Picture or any parts or portions thereof, and any literary or dramatic material included in the Picture or upon which the Picture is based, and to use in conjunction therewith any other literary, dramatic or musical material; and

    iii. use, license and authorize others to use the name, physical likeness and voice (and any simulation or reproductions of any thereof including still photographs from or relating to the Picture) of any party rendering services in connection with the Picture for the purpose of advertising, publicizing or exploiting the Picture.

h. To cause trailers of the Picture to be made (should Agent desire to make trailers) and prints thereof and of the Picture to be manufactured, exhibited and distributed by every means, method and device now or hereafter known.

i. To order and procure from Owner or directly from any laboratory holding pre-print or other material (including any dubbed, titled, narrated or other versions thereof) of the Picture, at Agent's cost, such number of release prints, sound recordings, pre-print material and any part or parts of any thereof, as Agent may, from time to time, require, in any and all sizes and gauges, for the exercise of its rights hereunder, and to cause the performances of such laboratory or other work (including hut not limited to the manufacture of dubbed, re-dubbed, titled, sub-titled, narrated and any and all language versions of the Picture used in the

5

Territory). Owner will, as one of the items of delivery to be made pursuant to this Agreement, deliver to Agent a statement, setting forth the details of any and all pre-print materials relating to the Picture together with the name and addresses of the laboratories having possession thereof. Further, Owner will as one of the delivery items hereunder, furnish to Agent Laboratory Access Agreements in the form of Exhibit "D" hereto annexed, signed by the laboratories having possession of said materials, and by Owner and by any other party whose consent may be necessary or required.

j.   The right to use or exercise any and all rights which Owner may now or hereafter have or acquire or which Agent may acquire to use the names, likenesses, voices and persona of all artists in connection with the advertising or exploitation of the Picture, including any commercial tie-ups. Agent may license, sub-license and/or assign all or any part of the rights granted to Agent under this subdivision to distributors, sub-distributors, licensees or sub-licensees.

k.   To assert, prosecute, handle and settle in any and all parts of the Territory all claims or actions or causes of action against any and all persons for the unauthorized or illegal use, copying, reproduction, release, distribution, exhibition or performance of the Picture or any part or versions thereof, or of the literary, dramatic or musical material upon which the Picture is based or which are used therein, or any part or version thereof, or of the literary, dramatic or musical material upon which the Picture is based or which are used therein, or any part or version thereof, or for the enforcement or protection of all or any rights herein granted or purported to be granted to Agent, together with full and complete authority and power of attorney in the name of Owner or otherwise to do all or any of the foregoing, and to execute, acknowledge, verify and deliver any and all consents, documents, releases or other papers or documents of any kind pertaining thereto or any part thereof in the name of, or on behalf of Owner;

l.   If the Picture has not been registered for copyright and if application for copyright can properly be made, Agent shall have the right, at its election (but not the obligation) to cause the Picture to be registered for copyright in Owner's name or in its name in any part of the Territory, and for such purpose, Agent is hereby appointed the attorney-in-fact of Owner. Agent shall be under no liability of any kind in the event there shall be failure to secure any such copyrights or in the event of any defect in any such copyrights. Any such copyrights shall be held by Agent in trust for the benefit of Agent and Owner as their respective interests may appear, during the Term. If the Picture or any of the material upon which it is based or which is contained therein or is used or synchronized therewith, is copyrighted in the United States or in any part of the Territory, and the Term extends into any term of renewal of any such copyrights, the grant herein made shall continue for and during such term of renewal or extended copyright, and Agent is hereby constituted and appointed attorney-in-fact of Owner to apply for and obtain in the name of Owner or otherwise, any such renewals or extensions of copyright, and to do all things and acts necessary or desirable in connection therewith, including, without limitation, the execution, acknowledgement, delivery and filing of any and all applications or assignments or other acts which Agent may deem necessary or advisable to accomplish any of the foregoing. Nothing herein contained shall be deemed to require Agent to apply for renewal of copyright or take any other action to comply with any statutory formality, it being understood that Agent's right to do so is entirely discretionary;

m.   The exclusive right to collect all royalties, fees and other revenues which Owner, or the registered copyright owner, is otherwise entitled to collect by reason of any statute,

6

governmental regulation, operation of Law or in any other manner, for, based upon or in connection with, in whole or in part, or directly or indirectly, any use of the Picture pursuant to any exercise of the Rights granted hereunder ("Copyright Revenues"), including the recording and/or retransmission of the signal embodying the Picture. In connection therewith, Owner agrees that Agent shall have the exclusive right to collect or to arrange for the collection of Copyright Revenues resulting from the secondary transmission or retransmission of the Picture, by any means now known or hereafter devised, in the Territory. Agent shall make or cause to be made all necessary claims, filings and collect or arrange for the collection of all Copyright Revenues for inclusion in Gross Receipts of the Picture. Agent shall determine the amount of Copyright Revenues allocable to the Picture and other programming consistent with the empirical data available to Agent. Owner shall make no separate claim to collect such Copyright Revenues.

16) Merchandising Rights. The term "Merchandising Rights" means the right to sell, lease, license, distribute, exploit, sublicense and otherwise deal in and turn to account, and to authorize others so to do, the right to arrange for commercial tie-ups with and endorsements, distribution and use of any article, product or service (including, without limitation, souvenir programs, picture or comic books, electronic games, toys, clothing, school supplies and the like) based upon or developed or created from any part or all of the Picture or the screenplay thereof, or the plot, characters, incidents, objects, logos, artwork, Advertising Materials or elements contained in said screenplay or the Picture, all of which are hereinafter collectively called "Merchandising Rights", subject to any applicable union, guild or collective bargaining agreement, or any third party contractual restrictions which have been approved in writing by Agent.

17) Motion Picture Copy. The term "Motion Picture Copy" means the embodiment of a motion picture in any physical form or surface, including, without limitation, film, tape, cassette, or disc. Where a specific medium is limited to exploitation by a specific physical form (for example, to exploitation of Videograms), then "Motion Picture Copy" with respect to such medium is limited to such physical form.

18) Music Rights. The term "Music Rights" means all rights under copyright and otherwise, throughout the Territory in and to the soundtrack and all original musical compositions and sound recordings contained upon the soundtrack of the Picture (collectively "Music") (it being agreed that the copyright shall be held by Owner), for the Term hereof, and all other rights with respect to the Music granted by third parties to Owner or its predecessor in interest, including without limitation, writers, performers and producers. The Music Rights specifically include, but are not limited to the sole and exclusive synchronization and public performance rights (whether or not for profit and whether or not in conjunction with the exhibition of the Picture) of and to any and all of the Music recorded or contained upon the soundtrack of the Picture. The Music Rights also include all music publishing rights in original music compositions, including without limitation the sole and exclusive right to collect and receive any and all royalties, fees and all other forms of remuneration for or in connection with such rights or the license or exercise thereof. Except for non-exclusive synchronization and performance licenses, the Music Rights shall include the sole right to grant licenses and to authorize others to grant licenses with respect to all rights under copyright in the Music.

19) Multimedia and On-Line Exploitation. The term "Multimedia and On-Line Exploitation" means and includes (but is not limited to) all rights to exhibit, transmit, sell, rent, disseminate, distribute and generally exploit the Picture and its elements by any means of enabling a multimedia presentation, whether interactive or otherwise, or the presentation, transmission or dissemination of the Picture and its elements on-line, by internets, intranets, distributed computer networks or similar systems or networks, including (but not limited to) by means of CD-ROM, CDI, 3DO, computer software,

7

interactive television transmission, Web TV, data transmissions by any method, means or device including without limitation, telephone systems, cable systems, Hertzian waves or otherwise, and any other means, method, technique, or device whether now known or hereafter devised, for enabling such a program, presentation or transmission.

20) <u>New Media</u>. The term "New Media" means all forms, mode, methods or medium of delivery, exhibition, transmission or any other form or any other as yet undevised method of bringing filmed or computer generated entertainment to the consumer.

21) <u>Non-Theatrical</u>. The term "Non-Theatrical" means exploitation of a Motion Picture Copy for direct exhibition before an audience by and at the facilities of either organizations not primarily engaged in the business of exhibiting motion pictures, such as in educational organizations, churches, restaurants, bars, clubs, trains, libraries, Red Cross facilities, oil rigs and oil fields, or by and at the facilities of governmental bodies such as in embassies, military bases, military vessels, and other governmental facilities flying the flag of any country in the licensed Territory, by means of any media now known or hereafter developed, including, without limitation, film, Videogram, closed circuit television and satellite transmission. By way of clarification, but not limitation, Non-Theatrical does not include Commercial Video, Public Video, Airline, Ship or Hotel exploitation.

22) <u>Pay TV</u>. The term "Pay TV" means all forms of Terrestrial Pay TV, Pay-Cable TV and Satellite Pay TV exploitation of a motion picture. Pay TV does not include any form of "pay-per-view" telecast or other similar exhibition.

23) <u>Public Video</u>. The term "Public Video" means exploitation of a Motion Picture Copy embodied in a Videogram for direct exhibition before an audience in a "mini-theater," an "MTV theater" or like establishment which charges an admission to use the viewing facility or to view the Videogram and which is not licensed as a traditional motion picture theater in the place where the viewing occurs.

24) <u>Publishing Rights</u>. The term "Publishing Rights" means all Rights, to the extent held by Owner, to publish, distribute and sell hard cover or soft cover printed publications of all or any part of the literary materials on which the Picture is based or artwork, logos or photographic stills created for use in the Picture which may be included in any novelization of this literary material, for sale to the public. The Publishing Right shall include so-called "Novelization Rights", which include the right, to the extent held by Owner, to publish or eause to be published the screenplay of the Picture and/or novelizations and/or other adaptations thereof including any translations thereof, into any language, throughout the Territory, if the screenplay is not based on any previously published literary property or previously produced stage play; or if the screenplay of the Picture is based on previously published literary property(s) or previously produced stage play(s) and if Owner (or its predecessor in interest) has obtained such rights from the author(s) or publishers of such previously published literary property(s) or previously produced stage play(s) (Owner hereby agreeing to use its best efforts to obtain such rights from said predecessor in interest or said author or authors), the right to publish or cause to be published the screenplay of the Picture and/or novelizations and/or other adaptations of the screenplay of the Picture, including any translations thereof into any language, throughout the Territory.

25) <u>Satellite Free TV</u>. The term "Satellite Free TV" means the up-link transmission of a Motion Picture Copy to a satellite and its down-link transmission to a terrestrial satellite reception dish for the purpose of viewing of the Picture on a television receiver in private living accommodations which is located in the immediate vicinity of the reception dish without a charge being made to the viewer for

the privilege of viewing the Picture. For purposes of this definition, neither governmental television receiver assessments nor taxes will be deemed a charge to the viewer.

26) Satellite Pay TV. The term "Satellite Pay TV" means the uplink transmission of a Motion Picture Copy by means of an encoded signal to a satellite and its down-link transmission to a terrestrial satellite reception dish and a decoding device for the purpose of viewing the Picture on a television receiver in private living accommodations which is located in the immediate vicinity of the reception dish and decoding device where a charge is made: (i) to the viewer for the right to use the decoding device for viewing a special channel which transmits the Picture along with other programming; or (ii) to the operator of a hotel, motel, apartment complex, co-operative, condominium project, or similar place located distant from the place where such broadcast signal originated for the right to use the decoding device to receive and retransmit the programming on such channel throughout such place.

27) Ship. The term "Ship" means exploitation of a Motion Picture Copy for direct exhibition in ocean going vessels, wherever located, which are operated by a shipping line flying the flag of any country in the licensed territory for which Ship exploitation is granted, but excluding shipping lines which are customarily licensed from a location outside the territory or which are only serviced in but do not fly the flag of a country in the licensed territory.

28) Soundtrack Rights. The term "Soundtrack Rights" means the right, privilege and authority to use and reproduce, to grant licenses to use and to reproduce, and to authorize others to grant licenses to use and to reproduce, the soundtrack of the Picture (except for musical compositions for which there is only a non-exclusive synchronization and performance license) or any part thereof in the manufacture of and for the purpose of manufacturing, selling or otherwise distributing and exploiting said soundtrack in the form of phonograph records, tapes, transcriptions, or any other form or medium of any nature (collectively "Phonorecords") whatsoever throughout the Territory. The Soundtrack Rights shall also include any and all rights throughout the Territory under copyright and otherwise, and the right to secure copyright throughout the Territory in and to the Phonorecords, for the full period of copyright and any renewals and extensions thereof.

29) Taxes. The term "Taxes" means all taxes, imposts, duties, tariffs, personal property, turnover, sales, use, transaction, film hire, excise, stamp, added value, remittance, release, and governmental fees of any nature, however denominated or characterized, imposed by any taxing authority in any territory, directly or indirectly, on any receipts (irrespective of character or origin) from a distribution agreement or in connection with a distribution agreement, prints, trailers and other material relating to the Picture, or the lease, license, distribution, exhibition or other disposition thereof, or the collection, conversion or remittance of monies therefor, and all payments and expenses with respect to contesting, compromising or settling (whether by litigation or otherwise) any Taxes, together with any interest and penalties with respect thereto.

30) Television. The term "Television" means all forms of Free TV and Pay TV exploitation of a motion picture.

31) Terrestrial Free TV. The term "Terrestrial Free TV" means standard over-the-air broadcast by means of Hertzian waves of a Motion Picture Copy which is intended for reception on a television receiver in private living accommodations without a charge being made to the viewer for the privilege of viewing the Picture. For purposes of this definition, neither governmental television receiver assessments nor taxes will be deemed a charge to the viewer.

9

32) Terrestrial Pay TV. The term "Terrestrial Pay TV" means standard over-the-air broadcast of any Motion Picture Copy by means of encoded Hertzian waves for reception on a television receiver in private living accommodations by means of a decoding device where a charge is made: (i) to the viewer for the right to use the decoding device for viewing any special channel which transmits the Picture along with other programming; or (ii) to the operator of a hotel, motel, apartment complex, co-operative, condominium project or similar place located distant from the place where such broadcast signal originated for the right to use the decoding device to receive and retransmit the programming on such channel throughout such place.

33) Theatrical. The term "Theatrical" means exploitation of a Motion Picture Copy for direct exhibition in conventional or drive-in theaters, licensed as such in the place where the exhibition occurs, which are open to the general public on a regularly scheduled basis and which charge an admission fee to view the Picture.

34) Videocassette. The term "Videocassette" means a VHS, Beta, High 8 or Video 8 cassette or electronic storage device in any authorized format designed to be used in conjunction with a reproduction apparatus which causes a motion picture to be visible on the screen of a television receiver. A Videocassette does not include any type of Videodisc.

35) Videodisc. The term "Videodisc" means any laser, optical scan or capacitance disc or other form of mechanical storage device designed to be used in conjunction with a reproduction apparatus which causes a Motion Picture to be visible on the screen of a television receiver. A Videodisc does not include any type of Videocassette.

36) Videogram. The term "Videogram" means any type of Videocassette, Videodisc, DVD or similar storage device now known or hereinafter devised, whether to augment or replace such devices.

2.     TERM. Notwithstanding the Term of the Agreement, Agent shall have the authority, exercisable consistent with this Agreement, to enter into subdistribution agreements which extend beyond the Term of this Agreement and any such agreements entered into or rights granted prior to the end of the Term of this Agreement which have not by their terms terminated or expired, shall remain in effect, and Agent shall nevertheless be entitled to the Distribution Fees on such Gross Receipts and to recoup any Distribution Expenses relating to such subdistribution agreement until such subdistribution agreement is terminated or expires by its terms.

3.     STATEMENT OF ACCOUNT AND REMITTANCE OF MONEY DUE.

       3.1.    Statements. Agent will render accounting statements ("Accounting") to Owner with respect to Gross Receipts received by Agent not later than sixty (60) days after the close of each accounting period during which Agent receives any Gross Receipts, and each such statement shall set forth in reasonable detail the Gross Receipts received by Agent during the accounting period and the permitted charges, recoupments, costs and expenses deducted from such Gross Receipts. The balance, if any, shown to be due to Owner by such statement shall be paid to Owner together with the accounting statement.

Unless otherwise set forth in the Basic Terms, for purposes hereof, the "Accounting Period" shall be quarterly for a period of two (2) years, commencing at the end of the calendar quarter in which acceptance of Delivery of the Picture occurs, semi-annually for a period of two (2) years thereafter and annually thereafter.

Notwithstanding anything to the contrary contained in the Agreement, Agent shall not be required to render an accounting statement hereunder for any accounting period in which Agent does not receive any Gross Receipts.

10

3.2.    Maintenance of Records. Agent will maintain at its principal place of business, in the United States, complete and accurate books and records, in United States currency, of all financial transactions regarding the Picture in accordance with generally accepted accounting principles in the entertainment distribution business, on a consistent, uniform and non-discriminatory basis throughout the Term. Such records will include, without limitation, all Gross Receipts derived by Agent, all distribution Fees charged against such Gross Receipts, all Distribution Expenses recouped from such Gross Receipts, all allowed adjustments or rebates made, and all cash collected or credits received.

3.3.    Audit Rights.

3.3.1.    Upon reasonable advance notice, during normal business hours and not so as to disrupt normal business activities, Agent will permit Owner, or an independent certified public accountant designated by such party and approved by Agent (the so-called "big four" accounting firms are hereby preapproved), to make an examination, at Owner's expense, and to audit, inspect and copy all of the books and records of Agent (including, without limitation, use of and access to any computer or other mechanical or electronic equipment, software or other database print-out) for the purpose of verifying the amounts remittable to Owner, pursuant to this Agreement and the actual out-of-pocket costs and expenses paid by Agent pursuant hereto. Specifically, Owner shall have access to the files, correspondence, agreements and related documentation of Agent so as to verify allocations of Gross Receipts to the Picture, as opposed to other films not owned by Owner for which Agent has licensed as a package. Owner may exercise such audit and inspection rights not more frequently than once each calendar year upon not less than thirty (30) days prior written notice to Agent. No such audit shall continue for more than thirty (30) business days, consecutively or in the aggregate, provided that Agent shall fully cooperate with Owner in the conduct of such audit.

Each statement rendered hereunder shall be binding upon Owner upon the expiration of twenty-four (24) months from and after the date upon which such statement is rendered, provided that this limitation shall not apply to any portion of any statement to which Owner files written objections at any time during said twenty-four (24) month period. If Owner so notifies Agent in writing of any such objections, such objections shall be deemed waived unless Owner commences appropriate legal proceedings within twenty-four (24) months from the date such party receives such notice. If, after the final conclusion of any such legal proceedings, or if Agent acknowledges, that it has underpaid Owner with respect to any payment due hereunder, Agent shall promptly pay to Owner the amount of any such underpayment.

3.4.    Reserves. If Agent reasonably anticipates incurring guild residual payments, uninsured claims or other reasonably anticipated costs, expenses or losses relating to the Picture, which, if and when incurred, will be properly deductible hereunder, Agent may set up appropriate reserves therefor; provided, however, that at no time shall the aggregate of any such reserves exceed more than ten percent (10%) of the Gross Receipts reported by Agent in any accounting statement. Such reserves shall be taken from Owner's share of Gross Receipts. Any such reserve will be liquidated within a reasonable time after the anticipated event, but, unless there is an active claim for which a reserve has been established, no such reserve shall be maintained for a period longer than one (1) year.

3.5.    Right to Cure. Agent may cure any failure to make timely payment under this Agreement, or to timely deliver any Accounting, within ten (10) business days after Owner sends notice thereof to Agent.

3.6.    No Double Deductions/No Double Inclusions - In no event shall any item of Distribution Expense, or cost, expense or charge deducted in computing an element of Gross Receipts or Owner's Share of Net Receipts be deducted more than once in the same calculation or computation hereunder. In no event shall

any item of any Gross Receipts be included in gross receipts more than once in the same calculation or computation hereunder.

3.7.    Allocations If the Picture is exploited in connection with other motion pictures, then Agent shall allocate receipts and expenses among such motion pictures and the Picture in a reasonable and customary manner.

4.    FOREIGN FUNDS. With respect to any Gross Receipts received by Agent in foreign funds, Agent shall convert any such funds to United States currency prior to remitting the same to Owner. The rate of exchange with respect to any such funds shall be the rate of exchange prevailing and reasonably available to Agent at the time Agent actually converts such funds into United States currency, and Agent shall have no obligation to convert any such funds to United States currency at any time prior to the time Agent is required to remit such funds to Owner hereunder so as to maximize the benefit of a favorable rate of exchange. If the transmission of any Gross Receipts derived from the Picture from any countries or territories into the United States is prevented by embargo, blocked currency regulations or other restrictions, then, if Agent elects by giving notice to Owner to such effect or Owner so requests by giving Agent notice to such effect, Agent shall (to the extent permitted under the laws of any such country wherein such monies are blocked or frozen) cause Owner's share of Gross Receipts to which Owner would be entitled upon transmission to the United States to be deposited in Owner's name (or in such name as Owner may designate) in any bank or other depository designated by Owner (or by Agent if Agent elects to so deposit such monies and Owner fails to designate a depository within five (5) business days) in such territory or country. Such deposit will, for the purposes of this Agreement, be deemed payment to Owner of the amount deposited (computed at the rate of exchange quoted in The Wall Street Journal at the time such deposit is made) and Agent shall have no further liability to Owner in connection with any monies so deposited.

5.    DISTRIBUTION POLICY.

5.1.    General. Agent has not made any express or implied representation, warranty, guarantee or agreement as to the manner or extent of any distribution or exploitation of the Picture, nor the amount of money to be derived from the distribution, exhibition and exploitation of the Picture, nor as to the maximum or minimum amount of monies to be expended in connection therewith, nor that there will be any sums payable to Owner hereunder, nor that the Picture will be favorably received by exhibitors or by the public, or will be distributed or exploited continuously.

Agent does not guarantee the performance by any subdistributor, licensee or exhibitor of any contract regarding the distribution and exploitation of the Picture. In no event shall Agent incur any liability based upon any claim by Owner that Agent has failed to realize receipts or revenue which should or could have been realized. Agent may settle, compromise, adjust, cancel, waive, give allowances to, not collect or not seek any remedy for collection of any contracts, debts or sums due with respect to the Picture, for any reason whatsoever. Agent may, if it so elects, refrain from releasing and/or distributing and/or exploiting the Picture, in any territory or portion thereof for any reason whatsoever.

Owner shall be bound by the terms of any agreements made by Agent or its Affiliates pursuant to any resolution of the Motion Picture Export Association (or similar organization) or made by Agent alone with any government or governmental agency relating to any particular country or territory. If the number of motion pictures which may be distributed by Agent in any country or territory shall be limited by government, industry or self-limitation, the selection of Motion Pictures to be distributed by Agent therein shall be made by Agent in its sole discretion.

The exercise by Agent of its sole business judgment pursuant to this Section and the other provisions of this Agreement shall be on a reasonable and nondiscriminatory basis.

      5.2.    Subdistributors. Agent may distribute or exploit the Picture either itself or through such other parties, including Affiliates of Agent, as Agent may, in its sole discretion, determine. Agent may license the Picture or Rights connected therewith to any and all theaters or other agencies in which Agent or its Affiliates may have an interest directly or indirectly upon such terms and rentals as Agent may deem fair and proper under the circumstances, provided such terms are negotiated at arms length and in good faith.

6.    DEDUCTIONS OF GUILD PAYMENTS AND RELATED ROYALTIES:

As between Agent and Owner, producer shall be solely responsible for the payment of residuals relating to the Picture. Owner shall promptly discharge, when due, all supplemental market, royalty or other residual payments. In the event Owner fails to discharge such obligations, Agent may, if it so elects (but absolutely does not so obligate itself to), discharge said sums in which case there shall be deducted from the yet unpaid portion of the Advance or from Owner's Share of Net Receipts all supplemental market, royalty or residual sums expended or incurred in connection with distribution of the Picture for television sales and other exploitation of the rights granted hereunder, including but not limited to royalties, supplemental market payments, participations or other sums paid for the account of Owner to any or all of the persons connected with the production of the Picture, or to the guilds or unions representing such persons, for the privileges or right to distribute the Picture on Television or in any other part of the Media.

To the extent Agent discharges Owner's obligations, Owner shall provide Agent with all information necessary as Agent requires in order to make payments for Owner's account to the guilds, unions or persons who are members thereof, as the case may be, and Owner hereby irrevocably authorizes Agent (but Agent shall have no such obligation) to make such payments for the account of Owner, and/or to furnish such guilds, unions or persons who have so requested information relating to any sums paid by Agent to Owner, the Gross Receipts of the Picture or any other data which Agent, in its discretion, may deem pertinent.

7.    ADVERTISING AND CREDIT. Agent shall comply with Owner's timely (before Delivery) written instructions as to contractual obligations as to credits to be accorded on the screen or in any paid advertising and publicity issued by Agent or under Agent's control, and shall provide in its agreements with subdistributors and licensees that such subdistributor and/or licensee shall also comply therewith and shall include the same provisions in any agreements entered into by such subdistributor with its subdistributor(s), if any; provided Agent has received such written instructions no later than the Delivery Date. This undertaking by Agent is solely for the benefit of Owner and not for the benefit of any third party. No casual or inadvertent failure by Agent or any of its subsidiaries, Affiliates, subdistributors or licensees to comply with contractual obligations as to credits to be accorded on the screen or in any paid advertising and publicity shall constitute a breach of this Agreement. Upon receipt by Agent of Notice from Owner that Agent or its subsidiaries have failed to comply with the credits furnished to Agent by Owner, Agent shall take such steps as are reasonably practical to cure such failure with respect to future screen credits, advertising and publication, provided the credits accorded by Owner conform to the provisions of this subparagraph, and in the event that such failure was casual or inadvertent there shall be no other remedy available to any person against Agent, its subsidiaries, Affiliates, subdistributors or licensees for any such failure. In no event shall Owner be entitled to seek or receive injunctive relief in connection with any failure by Agent to comply with the provisions of this Section. In no event shall Agent be liable or have any responsibility for any acts or omissions with respect to credits created by or under the control of an exhibitor, newspaper, magazine, broadcaster or other parties who are not subsidiaries or Affiliates of Agent.

8.    DUBBING, SUB-TITLING AND EDITING.

      8.1.    Owner's Requirements. Owner will timely (prior to Delivery) provide Agent with any contractual dubbing, sub-titling or editing requirements applicable to the Picture or its trailers. Agent will

comply with these requirements in creating an authorized dubbed, sub-titled or edited version of the Picture or its trailers.

8.2.    Agent's Rights. Subject to Owner's agreements with third parties, which limitations, if any, shall be set forth on a schedule delivered by Owner to Agent, and subject to any restrictions set forth in the Basic Terms, if any, the provisions of this Agreement, Agent will have the right to:  (i) dub the Picture in any language necessary to allow Agent to exploit the Rights in the Territory; (ii) sub-title the Picture in any language necessary to allow Agent to exploit the Rights in the Territory; (iii) edit the Picture, but only if necessary to meet censorship or exhibition requirements, or if Agent is otherwise legally required to do so; or to improve the marketability or commerciallity of the Picture, as Agent determines in its sole discretion; (iv) advertise, publicize and promote the Picture; (v) include in all such advertising and promotional publicity the name, voice and likeness of any person who has rendered services in connection with the Picture, but not as an endorsement for any product or service other than the Picture, and (vi) include at the beginning and the end of the Picture, Agent's credit or logo.

8.3.    Limitations. In exercising the rights set forth herein, Agent shall not alter or delete any credit, logo, copyright notice or trademark notice appearing on the Picture.

## 9.    DELIVERY AND RETURN.

9.1.    Essential Elements. Agent hereby acknowledges to Owner that there are no "essential elements" in connection with the Picture.

9.2.    Delivery. "Delivery" of the Picture means delivery to Agent of the materials specified in Schedule "D" hereto (the "Delivery Materials"). Owner will deliver the Delivery Materials to Agent at Owner's sole cost and expense; provided, however, that Agent shall assume all costs and expenses in connection with preparing dubbed, subtitled or edited (to the extent not required as a delivery item hereunder) versions of the Picture, and shall recoup such costs as a Distribution Expense. The Delivery Materials will be delivered to the delivery location reasonably specified by Agent.

9.3.    Inspection and Examination of Materials and Documents. Agent shall have the right to inspect and examine the materials to be delivered hereunder and to which access is given and to be given under this Agreement and to examine all the schedules and documents to be delivered hereunder within thirty (30) days after their delivery. In the event Delivery is not complete, Owner shall, within ten (10) calendar days of notice from Agent, deliver to Agent or afford access to Agent (where access to pre-print materials is to be provided) such items and documents which it shall have failed to deliver and provide prompt access to pre-print materials where access has not been secured. Notwithstanding the aforementioned cure period, in exigent circumstances, Agent may deny Owner such cure period and proceed with the remedies described in subparagraphs (a) or (b) below. If delivery of all documents and schedules shall not be completed within the time, manner and in accordance with the requirements of this Agreement or if complete access to all pre-print materials is not secured within the time, manner and in accordance with the requirements of this Agreement, Agent (without prejudice to any other right or remedy which may be available to it) may, but shall not be obligated to (a) itself supply at the cost of Owner, or require Owner to promptly supply, such items or materials which Owner failed to supply in the first instance, or (b) to deduct from the yet unpaid portion of the Advance or from Owner's Share of Net Receipts any and all monies theretofore paid by Agent to effect complete and proper delivery or access, or (c) to require Owner to refund any and all monies theretofore paid to it until Owner shall effect complete and proper delivery or access, or to (c) terminate this Agreement and all of the obligations of Agent hereunder, in which event, Owner will, upon demand, pay to Agent a sum equal to the aggregate of all payments to Owner plus costs and expenditures incurred by Agent. Acceptance of incomplete delivery shall not be deemed to be a waiver of Agent's right to demand and require full delivery of complete schedules and documents and complete access to pre-print materials as required by this Agreement.

14

9.4.     Holding of Materials. Title to all materials delivered to Agent will remain with Owner, subject to Agent's rights hereunder. Agent will exercise due care in safeguarding all materials and will assume all risk for theft or damage while the materials are in Agent's possession.

9.5.     Anti-Piracy Prevention. Agent will use its best efforts to protect the copyright in the Picture and to prevent unauthorized copying or other forms of piracy; provided, however, that no copying or piracy of the Picture not authorized by Agent or undertaken with its express knowledge shall constitute a breach of this Agreement by Agent or allow Owner to terminate this Agreement. Owner and Agent acknowledge that it is in their mutual best interests to prevent unauthorized copying or piracy of the Picture in the Territory and Owner and Agent agree to cooperate in any action or proceeding undertaken to prevent or remedy any such unauthorized copying or piracy.

9.6.     Additional Materials. In the event Owner requires access to or copies of any foreign language tracks or subtitled versions, masters, advertising or promotional materials, artwork, or other materials created by Agent in connection with its exploitation of the Rights, Agent shall accord Owner free access to such materials. Owner may manufacture copies of any such materials at Owner's sole expense. In the event Agent requires access to or copies of any foreign language tracks or subtitled versions, masters, advertising or promotional materials, artwork, or other materials created in connection with exploitation of the Reserved Rights (collectively "Additional Materials"), Owner shall accord Agent free access to any such Additional Materials which Owner has in its possession (subject to contractual limitations, if any) or under its control. Agent may manufacture copies of any such materials at Agent's sole expense.

9.7.     Return of Materials. At the end of the Term of this Agreement, Agent will, at Owner's election, either: (a) return all Physical Materials to Owner at Owner's expense or (b) destroy all Physical Materials and provide Owner with a customary certificate of destruction.

9.8.     Expiration of Copyrights of Picture Rights. If any of the original copyrights relating to the Picture will expire at any time during the Term and such copyright is renewable, Owner shall take all steps necessary to secure such renewal of copyright or, if Owner is not the proper renewal claimant, use all reasonable efforts to cause the renewal claimant to secure such renewal of copyright. If the motion picture rights in the literary property upon which the Picture is based or in the music contained in the Picture have been terminated at any time thereafter by reason of the fact that the copyright owner of such literary property or music has died or shall die and a renewal copyright was or is thereafter obtained by his or her heirs or by - reason of the fact that the Owner's license in such literary property or music has expired or shall expire then, Owner shall cooperate with Agent to secure appropriate assignments of or renewals of license in the motion picture rights in such literary property or music for Agent's benefit. Nothing herein contained shall be deemed to require Agent to secure or attempt to secure renewal copyright in the Picture or in any underlying material thereof.

Agent agrees not to delete or modify the copyright notice affixed to the Picture, provided it complies in all respects with applicable copyright laws. Agent further agrees not to delete or modify the screen credits afforded to cast, crew or other personnel as such credits appear on the positive prints of the Picture upon delivery.

10.     TERMINATION; DEFAULTS.

10.1.     Limitations. This Agreement shall not be capable of termination, revocation, cancellation, rescission or other abrogation for any reason whatsoever prior to the expiration of the Term, unless with the Consent of both parties in writing or if otherwise permitted by this Section.

15

10.2.    Effect on Existing Agreements. Notwithstanding any other provision of this Agreement, with respect to any subdistribution or licensing agreements or any assignments entered into by Agent in connection with the Rights, the following shall apply, notwithstanding any other provision of this Agreement:

10.2.1.  any termination, expiration, revocation, cancellation, rescission, repudiation, abrogation or failure of any aspect of this Agreement, occurring for any reason whatsoever, shall so far as Owner is concerned, be subject to and shall in no way affect any distribution or license agreements (or any provisions thereof or authorizations granted pursuant thereto) entered into by Agent in respect of the Rights (such distribution and license agreements and authorizations defined hereinafter as "License Agreements"), regardless of (inter alia) the length of the remaining term of any such License Agreements, and Owner shall undertake all of the obligations, rights and benefits of Agent thereunder in such event;

10.2.2.  Owner shall do nothing to disturb or interfere in any way with any rights under the License Agreements;

10.2.3.  all sales, assignments, pledges, encumbrances or other transfers of any nature whatsoever, made at any time whatsoever by, on behalf of or under the authority of Owner of all or any part of Owner's rights in the Picture, shall be subject to all such License Agreements; and

10.2.4.  if by operation of law or otherwise any rights in such License Agreements revest in or revert to Owner, then Owner will grant to such persons as Agent may designate effective immediately upon any such revesting or reverting all such rights under the affected License Agreements as necessary, appropriate or convenient in Agent's sole discretion, and the Owner hereby irrevocably appoints Agent as Owner's exclusive attorney-in-fact which appointment shall be deemed a power coupled with an interest, for its use and benefit, with full power of delegation, substitution and re-substitution, for the purpose of executing, acknowledging, filing and recording any and all documents and instruments and doing all other acts necessary or advisable to further accomplish the purposes aforesaid, this power of attorney to survive the dissolution, bankruptcy or other legal incapacity of Owner. Agent shall give Owner five (5) business days notice before exercising such rights.

10.3.    Agent's Default. In addition to any other event of default under this Agreement, Agent will default if Agent: (a) becomes insolvent or fails to pay its debts when due; (b) makes an assignment for the benefit of creditors, or seeks relief under any bankruptcy law or similar law for the protection of debtors, or suffers a bankruptcy petition to be filed against it or a receiver or trustee appointed for substantially all of its assets, and the same is not removed within thirty (30) days; or (c) fails to make a payment to Owner when due.

10.4.    Notice to Agent. Owner will give Agent written notice of any claimed default. If the default is incapable of cure, then Agent will be in default immediately upon the occurrence of the event giving rise to the default. If the default is capable of cure, then Agent will have ten (10) business days after its receipt of such notice to cure any monetary default, and twenty (20) business days after its receipt of such notice to cure any non-monetary default. Only if Agent fails to do so may Owner proceed against Agent for available relief.

10.5.    Owner's Default. In addition to any other event of default under this Agreement, Owner will default if Owner: (a) becomes insolvent or fails to pay its debts when due; or (b) makes any assignment for the benefit of creditors, or seeks relief under any bankruptcy law or similar law for the protection of debtors, or suffers a petition of bankruptcy to be filed against it or a receiver or trustee appointed for substantially all of its assets, and the same is not removed within thirty (30) days.

16

10.6.   Notice to Owner. Agent will promptly give Owner written notice of any claimed default. If the default is incapable of cure, then Owner will be in default immediately upon receipt of Agent's notice. If the default is capable of cure, then Owner will have ten (10) business days after its receipt of such notice to cure any monetary default, and twenty (20) business days after its receipt of such notice to cure any non-monetary default. Only if Owner fails to do so may Agent proceed against Owner for available relief, including terminating this Agreement if Agent so elects.

11.   REPRESENTATIONS AND WARRANTIES.

11.1.   Owner Representations and Warranties. Owner hereby represents and warrants to Agent, and covenants, as follows:

11.1.1.   Owner is duly organized and existing under the laws of the jurisdiction of its formation, and is duly qualified and in good standing in every other jurisdiction in which the nature of its business requires such qualification.

11.1.2.   The execution, delivery, and performance hereof are not in contravention of law or of any indenture, agreement, or undertaking to which Owner is a party or by which it is bound and the same are within Owner's corporate powers, have been duly authorized and are not in contravention of its charter, bylaws, or other incorporation papers.

11.1.3.   Owner bas full authority to enter into and completely perform this Agreement and to license the Rights to Agent. There are no existing or threatened claims or litigation which would adversely affect or impair the Rights.

11.1.4.   All information furnished by Owner to Agent, orally or in writing, its financial condition or otherwise, is and will be complete, accurate, and correct in all material respects at the time the same is furnished.

11.1.5.   Owner has fully complied and will fully comply hereafter with the requirements of all applicable laws, federal, state, and local.

11.1.6.   Owner has not sold, assigned, transferred or conveyed and will not sell, assign, transfer or convey, to any party, any right, title or interest in and to the Picture or any part thereof, or in and to the dramatic or literary material upon which it is based, adverse to or in derogation of the rights granted to Agent, and Owner has not and will not authorize any other party during the Term hereof to exercise any right or to take any action which will derogate from or compete with the rights herein granted or purported to be granted to Agent.

11.1.7.   There are, and will be, no claims, liens, encumbrances, limitations, restrictions or rights of any nature (including, without limitation, any liens or security interests in favor of any bank or other third party which may provide production financing for the Picture or may have otherwise loaned money to Owner or any other producer of the Picture) in or to the rights in the Picture licensed hereunder unless first expressly approved by Agent in writing, excluding only any liens which as a standard practice in the industry are required to be entered into in favor of any collective bargaining entity (e.g. Screen Actors Guild), laboratories or completion guarantor in connection with the Picture.

11.1.8.   Owner has, or will have as of the date of Delivery of the Picture, fully paid, satisfied, cured or discharged at the time due or required all of the following:

17

11.1.8.1.all claims and rights of owners of copyrights in literary, dramatic, musical rights and other property or rights in or to all stories, plays, scripts, scenarios, themes, incidents, plots, characters, dialogue, music, words and other material of any nature whatsoever appearing, used or recorded in the Picture;

11.1.8.2.all claims and rights of owners of inventions and patent rights with respect to the recording of any and all dialogue, music and other sound effects recorded in the Picture and with respect to the use of all equipment, apparatus, appliances and other materials used in the photographing, recording or otherwise in the manufacture of the Picture;

11.1.8.3.all claims and rights with respect to the use, distribution, performance, exhibition and exploitation of the Picture, and any music contained therein;

11.1.8.4.all costs of producing and completing the Picture, including without limitation, any and all compensation, including residuals (to the extent only that residuals payable in connection herewith are then due and payable), pension and welfare benefits and other payments required by applicable guild or union agreements, due or which may become due to any actors, musicians, directors, writers or others who participated in the Picture;

11.1.8.5.any liens, claims, charges, encumbrances, restrictions, agreements, commitments or arrangements whatsoever with any person, firm or corporation, or any obligation then due and payable and all defaults under, or breaches of, any contract, license or agreement which could, or would, in any way interfere with, impair, abrogate or adversely or otherwise affect any of the Rights granted to Agent hereunder; and

11.1.8.6.any other payments of any kind required to be made in respect, or as a result, of any use of the Picture, except to the extent expressly required to be defrayed by Agent hereunder.

11.1.9.  To the best of Owner's knowledge, neither the Picture, nor any part thereof, nor any materials contained therein or synchronized therewith, nor the titles thereof, nor the exercise by Agent of any right, license or privilege respecting the Picture, violates or will violate, or infringes or will infringe, any trademark, trade name, contract, agreement, copyright (whether common law or statutory), patent, literary, artistic, dramatic, personal, private, civil or property right or right of privacy or "moral rights of authors" or any other right whatsoever of, or slanders or libels, any person, firm, corporation or association whatsoever.

11.1.10.The main and end titles of the negative and preprint materials of the Picture contain, or will contain on Delivery of the Picture hereunder:

11.1.10.1.a legally sufficient copyright notice in the form and position authorized by the Universal Copyright Convention, the Berne Convention and the Buenos Aires Convention, including the symbol "©" ("c" in a circle) and the legend "All Rights Reserved" in close proximity to such notice. Owner has not done any act or omitted to do any act which has impaired the copyright in the Picture during the Term, and

11.1.10.2.all necessary and proper credits for the actors, directors, writers and all other persons appearing in or connected with the production of the Picture who are entitled to receive the same. Agent shall have the right to designate the form of, and to receive, credit in connection with the rights granted herein (including without limitation a distributor's credit and a so-called "presentation" credit).

11.1.11.Owner owns and controls, without any limitations or restrictions whatsoever, all motion picture performance, synchronization, mechanical license and all other rights granted hereunder in

18

and to the Picture and all subsidiary rights embodied therein and has obtained all necessary licenses required for the exhibition, performance, duplication, distribution, marketing and exploitation of the Picture hereunder (including the music contained therein) throughout the Territory and during the Term, for any and all purposes licensed hereunder and by every means, method and device now or hereafter known or required for the full, complete and unlimited exercise and enjoyment by Agent of each and all of the rights herein granted to it. The literary, dramatic and performing rights to all musical compositions in the Picture are controlled by the SOCIETY OF EUROPEAN STATE AUTHORS AND COMPOSERS, INC., AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS (ASCAP), BROADCAST MUSIC, INC. (BMI), or their affiliates or are in the public domain or are controlled by Owner to the extent required for the purpose of this Agreement.

11.1.12. There are no restrictions which would or could prevent Agent from distributing the Picture by any of the Media or means for which rights are granted to Agent hereunder and there are not and will not be any payments (out of any part of any revenues from the distribution or exploitation of the Picture or otherwise) which must be made by Agent to any actors, musicians, directors, writers or to other persons who participated in the Picture, or to any union, guild or other labor organization for any right to exhibit the Picture or as compensation in connection with such exhibition or for any other use of the Picture or any of the rights therein and thereto granted hereunder.

11.1.13. Owner has, or will have as of the date of Delivery of the Picture, duly and properly registered (and, if appropriate, renewed) the Picture for copyright in the United States or it can be so registered (and, if appropriate, renewed), and the copyright is or will be valid in the United States and in all countries party to the Universal Copyright Convention. The copyrights in the Picture and the literary, dramatic and musical material upon which the Picture is based or which are contained in the Picture will be valid and subsisting during the Term throughout the Territory, and no part of any thereof is in the public domain.

11.1.14. The Agent will quietly and peacefully enjoy and possess each and all of the rights, licenses and privileges granted or purported to be granted to it throughout the term and the Territory without impairment or hindrance on the part of any third party. There is not now outstanding any litigation or threatened litigation, or any claims or demands or threats of claims, with respect to the Picture, the literary, dramatic or musical material upon which the Picture is based, or which is used therein, or the physical properties thereof.

11.1.15. The Picture is, or on Delivery will be, fully synchronized with sound and dialogue in the English language. The original negative of the Picture is free of cracks, tears, scratches or abrasions, and may be used for the purpose of making pre-print material of acceptable fidelity (image, sound and color), to enable the manufacture of 16mm and 35mm prints and Video Devices. All negatives, internegatives, interpositives and other pre-print materials of the Picture to be delivered or made available to Agent will be at Delivery of a quality suitable for the manufacture therefrom of commercially acceptable positive release prints and Video Devices of the Picture and the trailer thereof, appropriate for broadcasting and exhibition in all of the Media and that said pre-print materials are and will remain, during the Term, free and clear of all liens, claims, debts and charges insofar as the rights of Agent are concerned.

11.2.   Agent's Representations and Warranties. Agent represents and warrants to Owner and covenants, as follows:

11.2.1.   Agent is duly organized and existing under the laws of the jurisdiction of its formation, and is duly qualified and in good standing in every other jurisdiction in which the nature of its business requires such qualification.

11.2.2.  The execution, delivery, and performance hereof are not in contravention of law or of any indenture, agreement, or undertaking to which Agent is a party or by which it is bound and the same are within its corporate powers, has been duly authorized and is not in contravention of its charter, bylaws, or other incorporation papers and Agent bas full authority to enter into and completely perform this Agreement.

11.2.3.  Agent has fully complied with and will fully comply hereafter with the requirements of all applicable laws, federal, state and local.

11.2.4.  Agent bas full authority to enter into and completely perform this Agreement. Agent has not, and will not, undertake any action which might impair Owner's rights under this Agreement. There are no existing or threatened claims or litigation which would adversely affect or impair Agent's ability to completely perform under this Agreement.

11.2.5.  Agent will honor all restrictions on the exercise of the Rights or any other rights granted in this Agreement as such restrictions may be duly and timely given to Agent by Owner in conformity with this Agreement.  Agent will not exploit any rights not specifically licensed to Agent in this Agreement, nor will Agent exploit the Picture outside the Territory or after the Term,

12.  INDEMNITIES.

12.1.  Owner's Indemnities.

Owner will defend, indemnify and hold harmless Agent (including its officers, directors, owners, shareholders, employees and agents) against any and all third party claims and expenses (including, without limitation, reasonable attorneys' fees) and liabilities due to a) Owner's breach of any of its obligations, representations or warranties set forth in this Agreement, b) Owner supplying Agent with any incorrect, inaccurate or incomplete information pursuant to this Agreement, including the Delivery Schedule, c) Agent being required to make any payments to any union, guild or labor organization, or if any member thereof claims that Agent's payment based upon the information supplied by Owner to Agent is incorrect, inadequate or insufficient.  Owner will remain responsible for honoring Owner's indemnities despite any assignment, expiration or termination of this Agreement.

12.2.  Agent's Indemnities.

Agent will defend, indemnify and hold harmless Owner (including its officers, directors, partners, owners, shareholders, employees and agents) against any and all third party claims and expenses (including, without limitation, reasonable attorneys' fees) and liabilities, due to Agent's breach of any of Agent's obligations, representations or warranties set forth in this Agreement.  Agent will remain responsible for honoring Agent's indemnities despite any assignment, expiration or termination of this Agreement.

12.3.  Notification: Control of Defense.

Each party agrees that, upon receipt or presentation of any claim or notification of the institution of any action with respect to which indemnification might be required hereunder, such party will promptly notify the other party in writing thereof.  With respect to any such indemnification, the indemnitor shall have the right to control the course and conduct of such defense.  Any such indemnitee shall have the right, in its discretion and at its sole expense, to retain independent counsel and to participate in any such defense.  If an indemnitor fails to promptly assume the defense of any claim, the indemnitee may do so and the indemnitor shall promptly reimburse the indemnitee for all costs and expenses (including but not limited to attorneys' fees and disbursements) incurred in connection therewith as such are incurred; in such case the indemnitee shall not

20

settle or compromise any claim without the consent of the indemnitor, such consent not to be unreasonably withheld.

13.    GENERAL PROVISIONS

      13.1.    No Third Party Beneficiary. Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any person other than the parties hereto (and in the case of indemnities, any Indemnitee) any right, remedy or claim, legal or equitable, under or by reason of this Agreement or any provision hereof, this Agreement and all of its provisions being intended to be and being for the sole and exclusive benefit of the parties hereto.

      13.2.    Waivers and Modifications. No waiver, modification, alteration or amendment of any provision hereof or of any right or remedy hereunder shall be effective unless in writing signed by the party against whom such waiver, modification, alteration or amendment is asserted, and then only to the extent set forth in such writing. No delay in the exercise of any right or remedy shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude other or further exercise thereof or the exercise of any other right or remedy.

      13.3.    Complete Agreement. This Agreement expresses the entire understanding of the parties hereto and replaces any and all former agreements, understandings or representations relating in any way to the subject matter hereof, and contains all of the terms, conditions, understandings and promises of the parties hereto in the premises. Each party acknowledges that no representation or agreement not expressly contained in this Agreement has been made to the other party or any of such parties' agents, employees or representatives. This Agreement may not be modified or amended except in writing signed by the party to be charged.

      13.4.    Assignment.

      13.4.1.  Agent may not assign or transfer this Agreement without Owner's prior written consent, which consent will not be unreasonably withheld. Nothing in this Section shall be deemed to prohibit Agent from exploiting any of the Rights through a subdistributor in accordance with Agent's customary subdistribution practices. Agent may transfer or assign this Agreement, without Owner's consent, to any wholly owned subsidiary or to any affiliated company which is wholly owned by any company which wholly owns Agent or to any entity acquiring all or substantially all of Agent's assets or film library; provided, however, that no such assignment shall relieve Agent of any of its obligations hereunder. In that case, all references to "Agent" in this Agreement will include such subsidiary or affiliated company.

      13.4.2.  Owner may, after Delivery is complete, assign, transfer or sublicense any of its rights under this Agreement, including, without limitation, an assignment or grant of a security interest to a bank or other lender as security for a loan to Owner, but no such assignment, transfer or sublicense will relieve Owner of its obligations under this Agreement, unless to an entity which acquires all or substantially all of Owner's assets. Notwithstanding the foregoing, Agent acknowledges that Owner may grant a security interest to Aramid Entertainment Fund Limited, or its related entities ("Aramid") prior to Delivery of the Picture in connection with Aramid's financing of the Picture.

      13.4.3.  Any purported assignment in violation of the provisions of this Section 13.4 shall be null and void.

      13.4.4.  Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the successors and assigns of each party.

21

13.5.    Governing Law. This Agreement shall be deemed a contract made under and shall be construed and enforced and the legality and validity of each term and condition shall be determined in accordance with the internal, local laws of the State of California, applicable to contracts fully executed and to be performed therein. The procedural law of such jurisdiction shall apply to the extent necessary to effect the arbitration or adjudication of disputes concerning this Agreement.

13.6.    Captions. The captions, headings, titles and subtitles herein are inserted solely for convenient reference only, shall not constitute a part of this Agreement and shall not be utilized or referred to in the construction or interpretation of this Agreement.

13.7.    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall constitute an original hereof and which together shall constitute one agreement.

13.8.    Notice. All notices, approvals, requests or demands ("Notices") which any party is required or may desire to give to the other hereunder shall be in writing, unless otherwise specified, and shall be addressed to the address provided for herein. All such notices shall be given in one of the following ways: (i) by delivery to the address set forth below for such party; or (ii) by mail, registered or certified (return receipt requested), postage prepaid, airmail (if available); or (iii) by transmittal by any electronic means whether now known or hereafter developed, including but not limited to, telex, telecopier, or laser transmissions, able to be received by the party intended to receive notice. If so delivered, mailed, telegraphed, cabled, or transmitted, each such notice shall, except as herein expressly provided, be conclusively deemed to have been given when delivered, or when electronically transmitted, or on the fifth business day following the date of mailing, as the case may be. Either parties' inadvertent failure to provide the courtesy copies referred to below shall not constitute a breach of this Agreement. Until further notice, the addresses and facsimile numbers of the parties for any such notice of payment shall be: The addresses of the parties shall be those of which the other party actually receives written notice and until further notice are:

Agent:

Foresight Unlimited, LLC
2934½ Beverly Glen Circle
Suite 900
Bel Air, CA 90077
Attn: Business & Legal Affairs
Fax: (310) 275-5202

To Owner:

The Ledge Distribution, LLC
2934 ½ Beverly Glen Circle
Suite 900
Bel Air, CA 90077
Fax: (310) 275-5202

13.9.    Arbitration

13.9.1.    Notwithstanding anything to the contrary contained in this Agreement, any controversy or claim arising out of or relating to this Agreement or any alleged breach thereof or issues regarding its interpretation or enforcement, shall be settled by binding arbitration in accordance with the rules of the Independent Film & Television Alliance ("IFTA") in Los Angeles County, California, as then in effect, and judgment upon the award rendered by the arbitrator shall be final and may be entered in any court baving

22

jurisdiction. Each party hereto agrees to submit to such arbitration. Notice of the demand for arbitration shall be filed in writing with the other party to this Agreement and with IFTA. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The party desiring arbitration shall serve notice upon the other party.

13.9.2. The arbitration shall be conducted in California in accordance with the rules of commercial arbitration then followed by IFTA, except as otherwise provided in this Section.

13.9.3. The arbitrator shall apply the internal laws of California and shall have the power to grant all legal and equitable remedies (including, without limitation, specific performance) and award damages provided by California law; provided, however, that the arbitrator shall take into account, in addition to the substantive law of California applicable to the matter disputed, the usages and customs of the entertainment industry. Any judgment, order or award of the arbitrator shall be final and binding upon the parties.

13.9.4. Each of the parties shall facilitate the arbitration by: (a) using their best efforts to proceed with the discovery process in an expeditious manner; (b) using their best efforts to cause any non parties to this Agreement to cooperate in the discovery process and in the presentation of evidence to the arbitrator and the other parties; (c) commencing the arbitration hearings promptly after a reasonable period of discovery and holding the arbitration hearings to the greatest extent possible on successive days; and (d) observing strictly the time periods established by the rules applicable to the arbitration or by the arbitrator for the submission of pleadings, evidence and briefs.

13.9.5. Judgment on any award by the arbitrator against any party may be entered in any court having jurisdiction thereof. All costs of the arbitration, including attorneys fees and other out-of-pocket expenses of the parties, whether or not such expenses might be deemed recoverable costs of litigation under the California Rules of Court, may be awarded or apportioned by the arbitrator to the party or parties that prevail in the arbitration. Each party shall pay its own attorneys fees and expenses pending the allocation thereof in the award to the prevailing party or parties.

13.9.6. The parties intend that this Agreement to arbitrate be valid, binding, enforceable and irrevocable. The terms of this Section shall survive the termination or expiration of this Agreement.

13.10. Severability. Nothing contained in this Agreement shall be construed so as to require the commission of any act contrary to law, and wherever any provision of this Agreement is held to be invalid or illegal under any material statute, law, ordinance, order or regulation, such provision shall be curtailed and limited only to the extent necessary to bring it within the legal requirements of this jurisdiction and such curtailment or limitation shall not affect the validity of the remainder of this Agreement or any other provisions hereof.

13.11. Lien and Security Interest. As security for the payment in full of all Distribution Fees, Distribution Expenses and recoupments to which Agent is entitled under this Agreement, Owner hereby grants to Agent a security interest in and to the Collateral, for all Obligations. In connection with Agent's security interest, Owner agrees that Agent shall have a non-exclusive right of access to all physical materials comprising the Picture necessary to allow Agent to enforce its security interest in the event Owner defaults in the payment of any sums due to Agent pursuant to this Agreement. Agent's access rights under this paragraph are subject to Owner's access rights in and to such material. In addition, Owner agrees to execute all documents reasonably necessary to allow Agent to perfect its security interest as set forth in this paragraph, including but not limited to a Mortgage of Copyright and UCC-1's.

23

The aforementioned security interest shall continue beyond the end of the Term to the extent such Distribution Fees, Distribution Expenses or other amounts to which Agent is entitled to recoup hereunder have not been recouped as of such termination date.

13.12.    Remedies. Any and all remedies of the parties hereunder, at law or in equity, are cumulative, and the exercise of any sueh right or remedy shall not preclude the exercise of any other right or remedy. No waiver by any party of any breach or default by any other shall constitute a waiver of any other prior, contemporaneous or subsequent breach or default, whether of the same or any other nature. Notwithstanding the foregoing, or anything to the contrary herein, in the event of a breach of any of the provisions of this Agreement by Agent, Owner's sole remedy for such breach shall be limited to an action at law for monetary damages and in no event shall Owner be entitled to rescind or terminate this Agreement or to seek any form of injunetive relief.

13.13.    Time. Time is of the essence with respect to this Agreement.

13.14.    Name and Gender. Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders, and the neuter gender shall include the masculine and feminine, as the context requires; and the words "person" or "party" shall include corporations, firms, partnerships, or other forms of association.

13.15.    Attorneys' Fees. If any legal action, arbitration or other proceeding is brought for the enforcement of or to declare rights or obligations under this Agreement or as a result of a breach, default or misrepresentation in connection with any of the provisions of this Agreement, the parties shall each pay their own costs and expenses incurred in connection therewith, including but not limited to attorneys' fees, attorneys' costs and court costs.

13.16.    Further Assurances. The parties hereto agree to execute and deliver such further documents and instruments as may be necessary or desirable to evidence, effectuate or confirm this Agreement, and any of the terms and conditions hereof. If Agent, on the one hand, or Owner, on the other hand, fails or refuses to execute or deliver to the other any such document or instrument, within five (5) business days after delivery of any such document or instrument and notice requesting the execution and delivery thereof, the non-executing party hereby appoints the requesting party as its attorney-in-fact, with full power of substitution and with the right, but not the obligation, to do any and all acts necessary, to execute and deliver such instrument or document, in the name and on behalf of the non-executing party, which appointment being coupled with an interest, is irrevocable.

13.17.    Not a Joint Venture, Loan or Sale. Nothing contained herein shall in any way be construed to interpret this Agreement as creating a partnership, joint venture or employment relationship between the parties hereto. Each party is acting independently hereunder and shall independently discharge all obligations imposed on it by any applicable federal, state or local law, regulation or order now or hereinafter in force or affect. Neither shall anything contained herein constitute a purchase or sale agreement. The parties hereby acknowledge that this Agreement constitutes an independent contracting relationship and that the relationship between the Owner and Agent is solely that of debtor and creditor with respect to sums due pursuant to this Agreement, if any. Agent shall not be deemed a trustee, pledgeholder or fiduciary.

Neither party shall hold itself out contrary to the terms of this Section, and neither party shall become liable for the representation, act or omission of the other contrary to the provisions hereof.

24

13.18.    Exhibits. All Schedules or Exhibits referred to in this Agreement or attached hereto is deemed incorporated herein by this reference as if set forth in full.

13.19.    Language in Agreement. The parties hereto acknowledge that they have required that the present Agreement, as well as all documents, notices and legal proceedings, executed, given or instituted pursuant to or relating directly or indirectly hereto, be given in English.

13.20.    Withholding: In the event that any claim or action is made or brought with respect to which Agent and its licensees, assigns and subdistributors are to be indemnified by Owner hereunder, Agent shall have the right to withhold from disbursements to or for the account of Owner any amounts otherwise payable by Agent to Owner pursuant to this agreement, to the extent that such amounts are necessary to satisfy any claim, cost, liability or settlement in connection with such claim or action, plus a reasonable amount to be determined by Agent to cover the expenses of contesting or defending such claim or action. Agent shall have the further right to apply the amount withheld to satisfy such claim, cost, liability or settlement. Owner shall remain liable, however, for any part of such claim, cost liability, settlement or expense not satisfied by application of such amount withheld.

13.21.    Setoffs. Notwithstanding anything to the contrary contained in this Agreement or any provision of the Law, Agent shall have the right to offset against any monies that may be due Owner pursuant to any provision of this Agreement or any other agreement or liability between the Parties, their Affiliates, or otherwise. Owner shall remain liable, however, for any part of such claim, cost, liability, settlement or expense not satisfied by the application of such setoff amounts.

13.22.    Force Majeure. Notwithstanding anything contained herein to the contrary, neither party shall be liable to the other in damages for any failure to perform hereunder due to any cause beyond its control, including but not limited to fire, earthquake, flood, epidemic, accident, explosion, casualty, strike, lockout, labor controversy, riot, civil disturbance, act of public enemy, embargo, war, act of God, governmental ordinance or law, the issuance of any executive or judicial order, any failure or delay in respect to the electrical or sound equipment or apparatus, or by any laboratory, any failure, without fault, to obtain material, transportation, power, or any other essential thing required in the conduct of its business or any similar causes. Each party shall use reasonable diligence to avoid such delay or default and to resume performance under this Agreement as promptly as possible after such delay or default.

25

**Foresight Unlimited, LLC**
("Foresight")
2934 _ Beverly Glen Circle, Suite 900
Bel Air, California 90077

As of September 12, 2006 (the "Effective Date")

Michael Mailer Films, Inc.
c/o Gray Krauss, Attorneys at Law
The Film Collective
349 Broadway Ave, 3d Floor
New York, NY 10013

Attn: Jonathan Gray, Esq.

Re:     An Original Screenplay (which, together with all rights therein and thereto or based thereon, is herein referred to as the "Screenplay") Tentatively Entitled *The Ledge* (by Matthew Chapman, hereinafter "Chapman") Intended as the Basis for a Feature-Length Motion Picture (the "Picture")

Dear Michael:

This letter will serve as the agreement between Michael Mailer Films, Inc. ("MMF") f/s/o Michael Mailer ("Producer") and Foresight Unlimited, LLC ("Foresight") (MMF, Producer and Foresight may hereinafter be referred to as the "Parties") in connection with the Picture and is made in reference of the following facts and agreements: 12, 2006 (the "Effective Date")

A. Reference is made to that certain Option Agreement between MMF and Chapman, dated July 1, 2005 (the "Option Agreement"). MMF represents that the Option Agreement is in full force and effect, and that the option granted pursuant to the Option Agreement extends through June 30, 2007. Subject to exercise of the option under the Option Agreement, MMF controls (or shall prior to any payments hereunder, own and control) all of the necessary rights in and to the Screenplay and all other rights necessary to produce the Picture. Foresight acknowledges receipt of the Option Agreement and hereby approves of the form and content thereof.

B. Subject to the right of reversion described in paragraph H below and payment of the ▆▆▆▆ Advance against MMF's development expenses (not applicable against the producer fee), MMF hereby irrevocably grants and assigns to Foresight, its successors, assigns and licensees, in perpetuity, throughout the universe all rights of every kind and nature in and to a) the Option Agreement, b) the Screenplay (to the extent owned or controlled by MMF), c) the Picture, d) all contracts related to the Picture, including that certain Director Agreement between MMF and Chapman, dated May 1, 2005 (the "Director Agreement"), which Director Agreement has been approved by Foresight, any and all rights related to or derived from the foregoing. In connection with such assignment,

dated July 1, 2005 (the
option is in full force and
ption Agreement extends through Jun
-1-

... derived from the fore... ...

Foresight assumes all executory obligations of the Option Agreement and Director Agreement.

C. Producer has provided Foresight with a tentative budget for the Picture which, with bond and contingency, is approximately ▓▓▓▓▓ not inclusive of finance charges, marketing and sales costs and expenses, overhead, and payments to producers (including Mark Damon) other than Producer. Furthermore, the budget provides for compensation to the four (4) principal cast members in an amount not to exceed ▓▓▓▓▓(not inclusive of overages and/or agency fees, if applicable). The parties acknowledge that the foregoing budget is only MMF's estimate, and that the actual production budget for the Picture shall be within Foresight's sole discretion. If Foresight produces the Picture, Michael Mailer shall be engaged to produce the Picture on a pay-and-play basis at a rate of compensation equal to ▓▓▓▓(the "Fixed Compensation") (payable twenty percent (20%) pro-rata during pre-production of the Picture; sixty five percent (65%) pro rata during principal photography of the Picture; ten percent (10%) upon delivery of the Director's cut of the Picture; and five percent (5%) upon delivery of the Picture). Notwithstanding the foregoing, in the event the direct cost in-going budget (i.e. above and below the line only, and not including bond, contingency, financing charges for the Picture, marketing and sales costs and expenses, overhead, and payments to producers other than Producer) exceeds ▓▓▓▓, the compensation payable to MMF in consideration for the producing services of Producer shall be ▓▓▓▓. In the event Producer is required to travel to a distant location (i.e., more than 50 miles from Producer's principal residence) in connection with the services to be rendered herein, Producer shall be provided with r/t transportation, accommodations and expenses on a basis no less favorable that Mark Damon and the director of the Picture.

D. Foresight has designated Mark Damon (hereinafter "Damon") to function with Producer as the sole named creative producers of the picture. In the event the Picture is produced pursuant to the terms hereof, Foresight shall be the distributor of the Picture in all media, throughout the universe, in perpetuity. Foresight shall be entitled to a distribution fee of fifteen percent (15%), inclusive of a sales representative fee to the William Morris Agency (as such may be agreed by Foresight with WMA) and other sub-agency fees, if any, in the Domestic Territory, and twenty (25%) percent in all other territories, inclusive of sub-agency fees. Foresight shall be entitled to recoup all actual out of pocket marketing and distribution expenses (up to a cap of ▓▓▓▓ with respect to the marketing of international sales) and a non-accountable market attendance charge of ▓▓▓▓. For avoidance of doubt, the marketing expense cap only applies to international sales activity and not actual distribution expenses in any particular territory, residuals, talent participations or delivery costs, among others.

E. During the first nine (9) months of this Agreement, Foresight shall make at least three (if not otherwise accepted) "pay-or-play" offers (not less than Schedule "F" minimum) during the Term, on such terms and conditions as Foresight shall deem acceptable, to secure the services of an actor for one of the leading roles in the Picture. Foresight acknowledges that MMF has heretofore made a conditional pay-or-play offer to Mandy Moore in connection with the Picture (the "Moore Offer") for the role of Shana (a copy of which is attached hereto).

-2-

F.  Within ten (10) days of Foresight's receipt of this Agreement signed by MMF,
    Foresight shall pay to MMF a non-refundable advance ("Advance") against
    MMF's development expenses (not applicable against the producer fee), in the
    sum of ▓▓▓▓▓. Within ten (10) days following receipt of such payment, MMF
    shall provide Foresight with evidence of MMF's extension of the Option
    Agreement through June 30, 2007.

G.  Producer and/or MMF shall execute any documents and do any other acts
    consistent herewith as may be reasonably required by Foresight or its assignees
    or licensees to further evidence or effectuate Foresight's rights as set forth in this
    Agreement, including, but not limited, to the Option Agreement. Upon Producer's
    or MMF's failure to do so after ten (10) days written notice, Producer and MMF
    hereby appoint Foresight as Producer's and MMF's attorney-in-fact for such
    purposes (it being acknowledged that such appointment is irrevocable and
    coupled with an interest) with full power of substitution or delegation. Copies of
    any such documents executed on behalf of MMF shall be provided to MMF within
    ten (10) days of execution thereof.

H.  In the event the Picture is not fully financed and formal pre-production has not
    commenced on or before the date nine (9) months from the Effective Date herein
    (the "Expiry Date"), all rights and obligations in connection with the Option
    Agreement in connection with the Screenplay shall automatically revert to MMF
    with no further obligations between the Parties. Notwithstanding the foregoing, in
    the event Foresight is in active negotiations with a prospective cast member that
    would "greenlight" the Picture by Foresight, Foresight may extend the Expiry
    Date by four (4) months upon written notice to MMF and payment to MMF in the
    sum of ▓▓▓▓▓▓▓▓▓▓▓ (the "Extension Payment"), half of which
    ▓▓▓▓ shall be applicable against any payments otherwise due to Producer
    and/or MMF herein.

I.  Producer and MMF represent and warrants that: (i) they have the right, power and
    authority to enter into and perform this Agreement; (ii) MMF owns all necessary
    rights in and to the Option Agreement, and, subject to the Option Agreement,
    Screenplay and Picture; all agreements relating to such rights are in full force and
    effect and neither Producer nor MMF are in default under any provision thereof and
    (iii) there are, and will be, no claims, liens, encumbrances or rights of any nature in
    or to Producer's and/or MMF's rights to the Option Agreement, Screenplay or
    Picture or any part thereof which can or will impair or interfere with the rights of
    Foresight hereunder; and (iv) none of the granted rights have been optioned,
    assigned or licensed by Producer or MMF or any party acting under the authority
    of or on behalf of either; (v) there are no written or oral agreements or
    commitments whatsoever with respect to the Screenplay or Picture or with
    respect to any rights of any kind and nature therein, other than as set forth in the
    Director Agreement, Option Agreement and Moore Offer.  Foresight hereby
    represents and warrants that: (i) Foresight has the full right and authority to enter
    into this Agreement (ii) Foresight is not subject to any obligation or disability
    which will materially prevent or interfere with the full completion and performance
    of all the obligations and conditions to be kept and performed hereunder. Each
    party shall indemnify and hold the other harmless from and against all liabilities,
    penalties, losses or expenses, including reasonable outside attorney's fees,

imposed upon, sustained or incurred by reason of the such parties breach of any of its representations and warranties made herein.

J.  If Foresight elects to produce the Picture hereunder, then:

1.  Foresight shall provide the producing services of Damon as contemplated above, for a fixed-sum fee equal to the fixed sum fee payable to MMF f/s/o Producer for producing services set forth in the approved budget for the Picture, as well as the other financial benefits afforded MMF f/s/o Producer (box office bonuses, net share, etc). Foresight shall also be entitled to charge and retain its customary 10% overhead charge as a part of the budget for the Picture. It is understood and agreed that in no event shall third party producer fees (including, but not limited to, producer and executive producer fees) exceed█████████in the aggregate.

2.  It is understood that the relevant equity investors in the Picture may be entitled to credits and production fees in connection with their investment, beyond such parties' interest as an investor in the Picture, and each party here acknowledges and hereby pre-approves such investor conditions.

3.  "Produced by" credit (assuming that each of the parties in fact produce the Picture as completed) shall be equal and shared solely by Damon and Producer, on screen in the main titles in the position directly adjacent to the Director credit as well as the end crawl and in the billing block of paid ads wherever the Director credit appears, in accordance with standard industry practices (with Producer in first position, Damon in second position), and it is the intention that such producer credits shall be equal in size, tied in placement and contiguous. Any and all other producer, executive producer or similar credits shall be subject to Foresight's approval. Any other "producer" credits shall be designated as "producer" hereunder and not as "produced by" unless Producer (provided Producer in fact produces the Picture) shall otherwise consent.

4.  Foresight shall accord the following credits in connection with the Picture to Producer's designees: (i) one (1) "co-executive producer" credit, on screen in main titles and in the billing block of paid ads (subject to excluded ads); (ii) one (1) "co-producer" credit, on screen in main titles and in the billing block of paid ads (subject to excluded ads); and (iii) one (1) "associate producer" credit in the end crawl.

5.  Foresight will have a production credit and will also have the right to designate a production company to share the above-title production credit, and except as required by the equity financiers of the Picture, no production company (including "presentation" or in "association with" or similar) credits shall be permitted absent Foresight's approval. Provided that Producer has in fact produced the Picture and is not otherwise in material breach of this Agreement, Foresight hereby pre-approves an on screen in the main titles "A Michael Mailer Production" adjacent to the

-4-

presentation credit(s) and in the billing block of paid ads whenever any company credits appear to Producer.

6. Producer's credits shall appear in any so-called "excluded ads" whenever any individual credit appears in such "excluded ads," excepting congratulatory and award ads (including nomination awards) in which only the person so congratulated receives credit.

7. Except as expressly provided herein, all aspects of Producer, MMF, or their designee's credit, and each of them, shall be determined by Foresight in its sole discretion. No casual or inadvertent failure to comply with the foregoing, or the failure by any third parties to comply with their agreements with Foresight in connection with the foregoing credit obligations shall constitute a breach of this Agreement by Foresight, provided that upon receipt of written notice from MMF specifying a material failure to accord credit properly in accordance with this Agreement, Foresight shall use best efforts to cure prospectively such material failure to accord MMF credit hereunder with regard to the pre-print and/or advertising materials created after the date of Company's receipt of such notice. Except as otherwise stated in this Agreement, all other aspects of credits to be afforded in respect of the Picture shall be in Foresight's sole discretion. Foresight shall contractually bind the U.S. distributor of the Picture, and shall use best efforts to contractually bind all other distributors to comply with the credit requirements set forth herein including, but not limited to, providing notice of credit requirements herein to such other distributors.

8. Producer shall perform the normal and customary "in-person" full time and producing services in connection with the Picture to the best of Producer's ability and shall have principal day-to-day producing responsibility consistent with the elements as reasonably approved by Foresight. In the event the Picture is greenlit prior to the Expiry Date, Producer's services in connection with the Picture shall be on a non-exclusive first priority basis until eight weeks prior to the commencement of principal photography on the Picture, thereupon exclusive through one week following wrap, and thereafter on a non-exclusive basis through delivery of the Picture as required by the distributor(s) of the Picture.

9. Upon request, the parties Producer and MMF shall enter into an industry standard producer agreement (subject to good faith negotiations) for the services of Producer, which agreement shall be in accordance with the terms set forth in this Agreement. Until such time as such is executed, MMF and Producer agree that in the event the Picture is greenlit, all of their contributions to the Picture are a work made for hire for Foresight.

10. Subject to MMF's full performance of all services and material obligations in connection with the Picture, MMF and one (1) guest shall be invited to attend all celebrity premieres (if any), initial festival screening (if any), and award shows (if nominated and if invitations to such awards show are made available to Foresight) in connection with the Picture. Foresight will not be

-5-

... subject to MMF's full performance ...
... ection with the Picture ...
... all celebrity premieres (if any) relating thereto ...

obligated to furnish MMF or MMF's guest with transportation or expenses, if MMF elects to attend such premiere, festival or awards show; provided however, if the Picture has a domestic theatrical distributor prior to the United States theatrical premiere, Foresight shall use its good faith efforts to have the distributor provide travel and expenses for MMF, or such of the foregoing as Foresight is able to obtain from the distributor, with respect to any premiere not in the Los Angeles metropolitan area. Producer shall be provided with travel and expenses on a basis no less favorable than Damon.

K. After the deduction of actual, verifiable third-party distribution fees and costs, sales commissions and actual verifiable out-of-pocket costs (including the fees and costs paid to Foresight and William Morris in connection with paragraph D above, which shall be treated as an unrelated third party in connection therewith), and including all third party participations and deferments to talent and third party financiers, directly in connection with the Picture, the recoupment of equity, plus, for purposes of the calculations to MMF and Chapman hereunder, a premium return on such equity money of up to twenty (20%) percent (for avoidance of doubt, there is no limitation on the return or profit participation Foresight may negotiate with equity investors, only that for purposes of calculation of recoupment for Net Proceeds allocable to MMF and Chapman, the return on investment is limited to a 20% fixed premium, and any profit participation is not limited), all remaining revenues received from the exploitation of the Picture (i.e. net sums after payment of the equity investor share) shall constitute "Net Proceeds". Following deduction of any third party Net Proceed participants (including cast, crew, financiers and Chapman [pursuant to the Director Agreement]) Foresight and MMF shall split the remaining Net Proceeds eighty five percent (85%) to Foresight and fifteen percent (15%) to MMF; provided however, the amount allocable to MMF shall be no less than five percent (5%) of one hundred percent (100%) of Net Proceeds. MMF and Chapman shall have standard accounting (i.e., quarterly for first 3 years of distribution and bi-annually thereafter) and audit rights. Furthermore, if the Picture is produced herein, MMF and Damon shall each be entitled to the following bonus compensation: (i) ▓▓▓ when the domestic box office of the Picture as reported in Variety (the "DBO") reached 3x the negative cost of the Picture; ▓▓▓ when the DBO reached 4x the negative cost of the Picture; and ▓▓▓ when the DBO reached 5x the negative cost of the Picture; (ii) a ▓▓▓ bonus in the event the Picture is nominated for an Academy Award for best picture; and ▓▓▓ for a win; and (iii) a ▓▓▓ bonus in the event the Picture is nominated for an Golden Globe for best picture; and ▓▓▓ for a win. All of the foregoing bonuses payable to MMF shall be advances against MMF's share of Net Proceeds;

L. Foresight may choose to "greenlight" the Picture in its sole and absolute discretion. For avoidance of doubt, any such "greenlight" decision will be subject to Producer's timely delivery to Foresight of an accurate and complete budget/production schedule (which have been received, but is not yet approved), an acceptable final version of the Screenplay (the draft dated _____ has been received but is not yet approved), the relevant "chain of title" (the Option Agreement hereby deemed as relevant chain-of-title) and binding written Director Agreement (Director Agreement dated July 1, 2005 has been received and is deemed accepted); and binding agreements with approved key talent .

-6-

M. Subject to reasonable consultation with Producer (if Producer is in full compliance with his obligations hereunder, and only with respect to material production decisions ), and subject to the terms of the Director Agreement, all creative and business approvals/decisions in connection with the production and distribution shall vest solely with Foresight.

N. As between Producers and Foresight, and subject to the terms of this Agreement, ownership of the Picture and rights therein or ancillary thereto shall be owned by Foresight. The parties expressly acknowledge and accept that Foresight shall not be required to produce the Picture unless and until it has approved all material elements for the Picture, and the financial and creative elements of the Picture otherwise comply with all of the requirements hereof (except to the extent otherwise approved in writing by Foresight). MMF shall have a thirty (30) day right of first refusal with respect to any subsequent production (with the terms of this transaction as a floor) and derivative works.

O. No action or omission by Foresight shall constitute a breach of this Agreement unless Producer first notifies Foresight in writing setting forth the alleged breach or default and Foresight does not cure the same within 10 days. In either event, with the exception of the failure to pay applicable advance and extension payments to MMF herein, the sole remedy of Producer and MMF shall be an action at law for damages, it being agreed that in no event shall either MMF or Producer seek or be entitled to injunctive or equitable relief by reason of any breach or threatened breach of this Agreement by Foresight or any assignee or licensee.

P. All results and proceeds of MMF and Producer's services hereunder, including, without limitation, all literary and musical material, designs and inventions of Producer, shall be deemed a work- made-for-hire for Foresight within the meaning of the copyright laws of the U.S. or any similar or analogous law or statute of any other jurisdiction and, accordingly, Foresight shall be the sole and exclusive owner thereof for all purposes, including, without limitation, in connection with the distribution, exhibition, advertising and exploitation of the Picture and any part thereof and the allied and ancillary rights therein, in each case, in all media and by all means now known or hereafter devised and in all languages, throughout the universe in perpetuity. Any services including, without limitation, writing services, rendered by Producer in connection with the Picture shall be covered by the preceding sentences (unless Foresight and Producer have entered into a separate written agreement for such services), and sums otherwise payable under this Agreement shall be deemed full payment for such services. If for any reason Producer's services are not deemed a work-for-hire for Foresight, then Producer hereby irrevocably assigns, grants and sets over unto Foresight, in perpetuity and throughout the Universe, all of Producer's rights of every kind and nature, including all rights of copyright, in and to the Picture and all of the results and proceeds of Producer's engagement and Producer's services hereunder.

Q. While the parties hereto expect to execute a more detailed agreement containing the above provisions and those additional provisions normally and customarily

parties hereto expect to all contained in agreements of this kind, unless and until such additional document(s) is/are executed between the parties, this agreement represents the entire agreement between the parties, supersedes any other statements or agreements in connection with the within subject matter, and may not be altered absent a signed amendment. All notices shall be in writing and sent to the above addresses or to such other addresses are communicated in writing by one party to the other. A courtesy copy of all notices sent to Foresight shall be sent to: Law Offices of Greg S. Bernstein, P.C. , 9601 Wilshire Boulevard, Suite 240, Beverly Hills, California 90210, Attention: Greg S. Bernstein, Esq. A courtesy copy of all notices sent to MMF and/or Producer shall be sent to: Gray Krauss LLP, 207 West 25th Street – 6th Floor, New York, NY 10001, Attn.: Jonathan Gray, Esq. This Agreement shall be governed in accordance with California law (and under California jurisdiction) applicable to agreements as if performed in said state. This Agreement shall not be interpreted so as to favor one party over another hereunder. Disputes under this Agreement shall be subject to final and binding arbitration before Judicial Arbitration and Mediation Services, Inc. ("JAMS"), and California shall be the exclusive venue for such dispute resolution (unless the parties otherwise agree in writing), each party to bear the respective costs of such arbitration, in accordance with JAMS rules. Each party hereto has been advised to have this Agreement reviewed by such party's attorney prior to execution.

The signatures below shall represent a binding agreement to the above.

Very truly yours,

Foresight Unlimited, LLC

By: _____

Mark Darnon, CEO

Agreed and Accepted:

Michael Mailer Films, Inc. f/s/o.Michael Mailer

By: _____

Michael Mailer, Authorized Officer.

By: _____

Michael Mailer, individually as Producer

-8-

# "The Ledge"

## CHAIN OF TITLE SUMMARY

1. **Short Form Assignment**

   Dated May 4, 2009

   Between Matthew Chapman and Michael Mailer Films, Inc.

   Matthew Chapman assigns all rights to Michael Mailer Films.

   Filed with Copyright Office on July 27, 2010

2. **Short Form Assignment**

   Dated March 24, 2010

   Between Michael Mailer Films, Inc. to The Ledge Productions, LLC.

   Assignment of rights from Michael Mailer Films to The Ledge Productions, LLC.

3. **Short Form Assignment**

   Dated October 1, 2009

   Between Foresight Unlimited, LLC and The Ledge Productions, LLC (a California LLC, subsequently renamed The Ledge Distribution, LLC).

   Assignment of rights from Foresight Unlimited to The Ledge Productions.

   Filed with Copyright Office on July 27, 2010

4. **Short Form Assignment**

   Dated October 29, 2010

   Between The Ledge Distribution, LLC (formerly The Ledge Productions, LLC) to The Ledge Productions, LLC.

   Assignment of rights from The Ledge Distribution, a California LLC, to The Ledge Productions, a Louisiana LLC.

   Filed with the Copyright Office on July 27, 2010

**5.    Form CO - Screenplay**

Title: The Ledge (dated February 26, 2010)

Author: Matthew Chapman

Copyright Claimant: Matthew Chapman

Filed with Copyright Office on February 25, 2010

**6.    Short From Literary Rights Assignment**

Dated March 4, 2010

Between The Ledge Productions, LLC and VIP Medienfonds 4 GmbH & Co. KG

Assignment of rights from The Ledge Productions to VIP.

**7.    Short Form Distribution Agreement**

Dated March 4, 2010

Between VIP Medienfonds 4 GmbH & Co. KG and Rising Star Pictures, LLC

Transfer of distribution rights from VIP to Rising Star.

**8.    Short Form Sub-Distribution Agreement**

Dated March 4, 2010

Between Rising Star Pictures, LLC and The Ledge Distribution, LLC

Transfer of distribution rights from Rising Star to The Ledge Distribution.

## SHORT FORM ASSIGNMENT

The undersigned ("Assignor"), for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, hereby irrevocably sells, grants, assigns and sets over unto Foresight Unlimited, LLC ("Assignee") throughout the "Territory,"(as defined below), all right, title and interest in and to the motion picture currently entitled "The Ledge" (the "Picture"):

"Territory": The Territory shall mean German speaking Europe, i.e. Germany, Austria, South Tyrol (Alto Adige), Liechtenstein and Luxembourg. The Territory shall mean Switzerland only to the extent as defined as Licensed Swiss Rights, provided that the rights not defined as Licensed Swiss Rights are Reserved Swiss Rights and provided furthermore that such Reserved Swiss Rights are subject to the Swiss Holdback agreed hereunder.

Licensed Swiss Rights are defined as the non-exclusive TV Rights (and Free VOD Catch Up Rights), including the Swiss 3SAT-Rights. Swiss 3SAT Rights are the TV Rights (including Free VOD Catch Up Rights) for the cooperative program of 3SAT for the Territory of Switzerland (German speaking program).

Swiss Holdback on a media by media basis means that none of the Reserved Swiss Rights shall be exploited prior to the first release of such right in Germany.

"Term": Twenty-Five Years from delivery and acceptance of all materials by the German distributor, plus six months non-exclusive sell-off period.

IN WITNESS WHEREOF, Assignor has executed this Short Form Assignment as of July 5, 2010.

LEDGE DISTRIBUTION, LLC

By: _____

Its:

## ASSIGNMENT

For good and valuable consideration, receipt of which is hereby acknowledged, the undersigned, Matthew Chapman ("Assignor") hereby irrevocably grants, sells and assigns to Michael Mailer Films, Inc. ("Assignee"), all motion picture, television, home video, subsidiary and allied rights and other rights, in all languages and for the entire universe in perpetuity in and to that certain screenplay entitled, "The Ledge" (the "Property"), and all adaptations, dramatizations and translations thereof and the titles and themes thereof.

This assignment is executed and delivered pursuant to that certain letter agreement ("Agreement") dated April 24, 2009 between Assignor and Assignee relating to the Property. Reference is hereby made to the Agreement for further particulars with reference to Assignee's rights in, to and with respect to the Property and this Assignment is subject in all respects to the Agreement.

IN WITNESS WHEREOF, Assignor has executed this assignment on the __4__ day of __May 2009__, 2009.

("Assignor")

By: _____

Matthew Chapman

## SHORT FORM ASSIGNMENT

The undersigned ("Assignor"), for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, hereby sells, grants, assigns and sets over unto The Ledge Productions, LLC ("Assignee") throughout the universe in perpetuity, all of Assignor's right, title and interest in and to the motion picture screenplay referenced below, including without limitation the rights set forth in that certain option/producing agreement (the "Agreement") dated as of September 25, 2009 between Assignor and Michael Mailer Films, Inc. ("Lender") f/s/o Michael Mailer ("Artist"), with respect to the original motion picture screenplay entitled "The Ledge" written by Matthew Chapman. Assignor specifically assigns to Assignee all rights and obligations (and Assignee hereby accepts such assignment and assumes all such obligations) pursuant to the Agreement.

IN WITNESS WHEREOF, Assignor has executed this Short Form Assignment as of October 1, 2009.

FORESIGHT UNLIMITED, LLC

By: _____
Its:
    C E o



# Certificate of Recordation

This is to certify that the attached document was recorded
in the Copyright Office on the date and in the place shown below.

This certificate is issued under the seal of the
United States Copyright Office.

DATE OF RECORDATION

27Jul10

| VOLUME | DOC. NO. |
|--------|----------|
| 3592 | 738 |

| VOLUME | DOC. NO. |
|--------|----------|
| | |

*Maria A. Pallante*

Acting Register of Copyrights and
Associate Librarian for Copyright Services

**Document Cover Sheet**
UNITED STATES COPYRIGHT OFFICE

Copyright Office fees are subject to change.
For current fees check the Copyright Office website at
www.copyright.gov, write to the Copyright Office,
or call (202) 707-3000.

**For Recordation of Documents**

Volume _3592_   Document _738_

Volume _____   Document _____

Date of recordation   M _7_   D _27_   Y _10_
(ASSIGNED BY THE COPYRIGHT OFFICE)

Funds received _____

**DO NOT WRITE ABOVE THIS LINE · SEE INSTRUCTIONS ON REVERSE**

To the Register of Copyrights: *Please record the accompanying original document or properly certified copy thereof.*

**1** First party name given in the document   Foresight Unlimited
(IMPORTANT: *Please read instruction for this and other spaces.*)

**2** First title given in the document   The Ledge

**3** Total number of titles in the document   1

**4** Amount of fee calculated   ▉▉▉▉▉

**5** Fee enclosed
☐ Check   ☐ Money order
☑ Fee authorized to be charged to Copyright Office deposit account

Deposit account number _____
**Thomson CompuMark**   081794
Deposit account name _____

**6** Completeness of document   ☑ Document is complete by its own terms   ☐ Document is not complete. Record "as is."

IMPORTANT NOTE: *A request to record a document "as is" under 37 CFR §201.4(c)(2) is an assertion that: (a) the attachment is completely unavailable for recordation; (b) the attachment is not essential to the identification of the subject matter of the document; and (c) it would be impossible or wholly impracticable to have the parties to the document sign or initial a deletion of the reference to the attachment.*

**7** Certification of Photocopied Document   Complete this certification if a photocopy of the original signed document is substituted for a document bearing the actual original signature.
NOTE: *This space may not be used for documents that require an official certification.*

I declare under penalty of perjury that the accompanying document is a true and correct copy of the original document.

Signature _____   Date _____

Duly authorized agent of _____

**8** Return to:   Name   Mark Damon

Number/street   2934 1/2 Beverly Glen Circle #900   Apt/suite _____

City   Los Angeles   State   CA   Zip   90077

Phone number ▉▉▉▉▉   Fax number   (310) 275-5202

Email ▉▉▉▉▉

SEND TO: *Library of Congress, Copyright Office, Documents Recordation Section, 101 Independence Avenue SE, Washington, DC 20559-6000*
INCLUDE ALL THESE TOGETHER: (1) Two copies of this form; (2) payment from a deposit account or by check/money order payable to *Register of Copyrights*; and (3) your document.

FORM DCS   REV: 09/2007   PRINT: 09/2007 — ••,000   Printed on recycled paper

U.S. Government Printing Office: 2007-330-945/60,•••

ORIGINAL

## SHORT FORM ASSIGNMENT

The undersigned ("Assignor"), for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, hereby sells, grants, assigns and sets over unto The Ledge Productions, LLC ("Assignee") throughout the universe in perpetuity, all of Assignor's right, title and interest in and to the motion picture screenplay referenced below, including without limitation the rights set forth in that certain option/producing agreement (the "Agreement") dated as of September 25, 2009 between Assignor and Michael Mailer Films, Inc. ("Lender") f/s/o Michael Mailer ("Artist"), with respect to the original motion picture screenplay entitled "The Ledge" written by Matthew Chapman. Assignor specifically assigns to Assignee all rights and obligations (and Assignee hereby accepts such assignment and assumes all such obligations) pursuant to the Agreement.

IN WITNESS WHEREOF, Assignor has executed this Short Form Assignment as of October 1, 2009.

V3592 D738
Page 1

FORESIGHT UNLIMITED, LLC

By: _____
Its:

CEo



V3592 D738

## SHORT FORM ASSIGNMENT

The undersigned ("Assignor"), for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, hereby sells, grants, assigns and sets over unto The Ledge Productions, LLC ("Assignee"), a Louisiana limited liability company, throughout the universe in perpetuity, all of Assignor's right, title and interest in and to the motion picture screenplay referenced below, including without limitation the rights set forth in the following agreements (the "Agreements"):

1.    The option/producing agreement dated as of September 25, 2009 between Assignor (The Ledge Productions, LLC [which entity has since changed its name to The Ledge Distribution, LLC], a California Limited Liability Company), and Michael Mailer Films, Inc. f/s/o Michael Mailer, with respect to the original motion picture screenplay entitled "The Ledge" written by Matthew Chapman;

2.    The Co-Executive Producer Agreement dated as of September 24, 2009 between Assignor and Al Chemist Productions, Inc. f/s/o Terrence Howard with respect to Howard's co-executive producing services in connection with the motion picture currently entitled "The Ledge" (the "Picture"); and

3.    The Player Agreement – Theatrical Loanout dated as of September 25, 2009 between Assignor and Al Chemist Productions, Inc. f/s/o Terrence Howard with respect to Howard's acting services in connection with the Picture.

Assignor specifically assigns to Assignee all rights and obligations (and Assignee hereby accepts such assignment and assumes all such obligations) pursuant to the Agreements.

IN WITNESS WHEREOF, Assignor has executed this Short Form Assignment as of October 29, 2009.

THE LEDGE DISTRIBUTION, LLC
A California Limited Liability Company
(previously named The Ledge Productions, LLC)

By: _____
Its:

AGREED AND ACCEPTED:
THE LEDGE PRODUCTIONS, LLC
A Louisiana Limited Liability Company

By: _____
Its:



# Certificate of Recordation

This is to certify that the attached document was recorded in the Copyright Office on the date and in the place shown below.

This certificate is issued under the seal of the United States Copyright Office.

| DATE OF RECORDATION | |
| --- | --- |
| 27Jul10 | |
| VOLUME | DOC, NO. |
| 3592 | 737 |
| VOLUME | DOC, NO. |

Maria A. Pallante

Acting Register of Copyrights and
Associate Librarian for Copyright Services

C-762 · JANUARY 2011 — 5,000